[Civ. No. 12175.   First Dist., Div. Two.   July 21, 1942.]

Estate of MARY ALICE CONNORS, Deceased. JOSEPH CONNORS, as Guardian, etc., Respondent, v. THOMAS I. CONNORS, Appellant.

John T. McCarthy and J. Bruce Fratis for Appellant.

Frank J. Hennessy for Respondent.

DOOLING, J. pro tem.—In 1910 the decedent, Mary Alice Connors, was living with her mother, two brothers and two sisters in the mother's home at 207 Hoffman Avenue in San Francisco. She was an unmarried woman in her early thirties employed by the telephone company. On February 28, 1910, she resigned her position "on account of ill health" and disappeared from the family home. She remained absent until some time in August of 1910 when she telephoned to her sister Maud from a hotel at Fourth and Mission Streets in San Francisco to come and help her home with her luggage. She was reinstated in her position with the telephone company on September 1, 1910. During the decedent's absence from home the incompetent Joseph Thomas Murphy was born in Los Angeles. His baptismal certificate introduced into evidence herein recites that he was the son of Francis T. Murphy and Mary A. Holland Murphy, born in St. Vincent's Hospital, Los Angeles, California, on the 29th day of July, 1910.

In 1915 the decedent told the members of her family, then living at 207 Hoffman Avenue with her, that she would like to bring a young boy into the home as a boarder. She arranged with her sister Maud to take charge of the boy for

an agreed compensation of fifteen dollars per month. A few weeks later she brought Joseph Thomas Murphy, who then appeared to be five or six years old, to the family home. He slept in a crib in the decedent's room and during the daytime was looked after by the sister Maud. This arrangement continued until 1918, Maud receiving fifteen dollars per month from the decedent for the care of the boy during that period. In 1918 Maud accepted employment outside of the household and the payments of fifteen dollars per month to her from decedent ceased. Decedent and young Murphy continued to live at 207 Hoffman Avenue for several years and then both went to live with decedent's maternal uncle at 743 Baker Street in San Francisco. The boy went to school successively at the Noe Valley Primary School and St. Paul's School in San Francisco and at St. Joseph's College in Mountain View. At St. Paul's decedent paid his tuition and at St. Joseph's it was paid by decedent's uncle, Thomas Madden, with whom they were then living. The records of St. Joseph's College show the names of the boy's parents as Frank Murphy and Mary Holland and Thomas Madden is shown thereon as his uncle.

In 1931 or 1932 young Murphy was compelled by ill health to leave St. Joseph's College and in 1932 he was adjudged insane and committed to Agnews State Hospital. The affidavit of insanity was sworn to by decedent. In the report of the medical examiners she was described as "distant nearest relative," and in the judgment of insanity she and Thomas Madden were described as "relatives."

In 1934, Murphy having in the meantime been discharged from the state hospital, he was again adjudged insane. Decedent again made the affidavit of insanity, and was described both in the certificate of medical examiners and the judgment of insanity as "cousin."

Decedent died in 1940, having never been married, leaving a holographic will which named her brother, Thomas I. Connors, appellant herein, executor and left to him the bulk of her estate. Small amounts were left to her sister Maud, her brother Joseph and to another brother who predeceased her. Joseph Thomas Murphy was not mentioned in the will. Joseph Connors as guardian of Murphy appeared in the probate proceedings alleging that Murphy was the illegitimate son of decedent and praying that the estate be distributed to him as a pretermitted heir. From a decree finding Murphy

to be the son of decedent and ordering the estate distributed to him this appeal is taken.

In addition to the facts recited above it was established on the trial that Holland was the family name of collateral relatives of decedent's father living in the eastern part of the United States, none of whom had ever been seen by any of the witnesses, that no persons claiming to be relatives had ever visited Murphy, that decedent frequently referred to Murphy as her nephew, and that she also frequently stated that his mother was a close friend of hers who had died and his father was a railroad company employee.

Against this background of undisputed facts Maud Connors testified that on the evening that decedent brought young Murphy to their home in 1915 she said to decedent that if she was to have the care of the boy she hoped that his relatives would not be bothering her by visiting him, and that decedent after asking her to keep the disclosure secret whispered in her ear: "I am his mother." She further testified that out of respect for her sister's wishes she did not disclose this conversation to anyone until after her sister's death.

Joseph Connors testified in answer to a direct question about the common reputation in the Connors family as to the maternity of Joseph Thomas Murphy:

"My deceased sister, Mary, was known as his mother in the family—as the boy's mother."

On cross-examination he stated that by "common reputation" he meant "common knowledge . . . taking care of the boy, clothing him, looking after his welfare and physical condition . . . paying all his bills and clothing him."

He further testified that he had never heard his sister Mary say that she was the boy's mother and that shortly after the boy was brought into the household he had asked his mother about the boy (the witness was about nineteen years of age at that time) and "she told me not to bother my head about it; in other words, I was told to mind my own business." His mother never told him that Mary was the boy's mother. However, his brother, Frank, and his sister, Christine, both deceased at the time of trial, told him that Mary was young Murphy's mother, and his sister Agnes, also then deceased, "from the way she took care of him—she was closely associated with my sister Mary—from her actions, from the way she spoke; that is she believed my sister Mary

—from conversations I had with her—'was the mother of the boy.''

This evidence of declarations and acts of deceased members of the family was admissible to prove the relationship in issue (§§ 1852 and 1870, subd. 4, Code Civ. Proc.; *Estate of Flood*, 217 Cal. 763 [21 P. (2d) 579]) as was the testimony of Joseph Connors as to common reputation in the family. (§ 1870, subd. 11, Code Civ. Proc.) This is not disputed by appellant, but he argues that as to Maud Connors' testimony it was of a single conversation with the testatrix and that unsupported testimony of a single declaration by a deceased person has been characterized as the weakest of all kinds of evidence. (10 Cal. Jur. 1097 and cases collected in footnote 7.) The same argument is directed against the testimony of Joseph Connors as to the declarations of his brother Frank and sister Christine and the acts and conduct of his sister Agnes. As to his testimony of common reputation in the Connors family appellant points out that on cross-examination it proved to be based on his sister Mary's conduct and the conduct and equivocal declarations of Agnes and on isolated declarations of Frank and Christine; and that neither Mary, Maud, Thomas, Agnes, nor their mother, nor their uncle Thomas Madden, ever declared to Joseph that Thomas Murphy was Mary's son.

We may put aside Joseph's testimony as to common reputation, as having no more probative value than the facts on which it was based. There remains as direct evidence of maternity Maud's testimony of the declaration made to her by her sister Mary, and Joseph's testimony of the declarations made to him by his brother Frank and his sister Christine. Granted that this is the ''weakest kind of evidence possible,'' it is none-the-less both at common law and under the express provisions of our code above cited admissible and competent to prove pedigree. And in evaluating its weight the trial judge was not bound to isolate it from its background and consider it as if in a vacuum. This evidence, which uncorroborated might have been regarded as the lifeless bones of an unarticulated skeleton, was given flesh and contour by the other facts in evidence, undisputed and unimpeached. Standing alone Mary's abrupt and unexplained absence from her home from early March to late August, 1910, during which time Joseph Thomas Murphy was born in Los Angeles; the coincidence of his mother's first name and mid-

dle initial as shown on his baptismal certificate, "Mary A.", being identical with that of the testatrix' and the surname Holland being familiar in the family as collaterals of the testatrix' father; his introduction into the family home by the testatrix with only the most evasive sort of explanation; and her subsequent conduct in supporting him and keeping him with her in her homes and referring to him variously as nephew, cousin and relative might do no more than raise a strong suspicion of maternity. Standing alone the testimony of Maud as to the isolated declaration of the testatrix in 1915 and of Joseph as to the isolated declarations of Frank and Christine might be held to have slight probative value. But assembled the two fit together as patly as the two parts of a jig-saw puzzle. Each takes form and substance from the other. Not only does the recited evidence as a whole in our opinion amply support the finding of the trial court, but in the absence of contradiction we doubt if it would support a contrary finding. Whatever might be the rule as to the weight to be given to uncorroborated testimony of isolated declarations of deceased persons, when corroborated by other evidence it will support a finding in accordance with the declarations. (*Harp* v. *Harp,* 136 Cal. 421 [69 Pac. 28] ; *Estate of Williams,* 128 Cal. 552 [61 Pac. 670, 79 Am. St. Rep. 67].) In weighing the testimony of Maud and Joseph Connors the court was also entitled to consider that as beneficiaries under the will they were both testifying against their own interest, a fact said in *Harp* v. *Harp, supra,* to "tend very much to soften the rule" as to the weakness of such testimony, "or at least to make its application less rigid."

The suggestion that it is improbable that the testatrix in 1915 would be likely to make any explanation or confide the fact of maternity to Maud when their mother was the head of the household is met by the testimony of Joseph that "Maud wanted to go to work at that time, and so it would not be necessary for her to go to work my sister agreed to pay her to take care of the boy."

A physician who took care of the testatrix in her last illness testified that in 1939 when he first examined her he found that she had an unbroken hymen and that from his experience it would have been impossible for that reason for her to have given birth to a child in the normal way. On cross-examination he stated that he made no written record of the presence of an unbroken hymen but had a clear recol-

490

lection of the fact because it made his examination of his patient difficult. Appellant argues that this being expert testimony on a matter of scientific and specialized knowledge is conclusive in the absence of contradiction by other expert testimony. Passing the possibility of a caesarean birth, as to which there was no evidence either way, the witness' opinion was based on his testimony of a physical finding. The presence or absence of an unbroken hymen was not the subject exclusively of expert testimony. It was a fact which could have been observed and testified to by a lay person as well as a physician. (*Borkheim* v. *Borkheim*, 65 Cal. App. 218, 222 [223 Pac. 429].) Conceding that the opinion of the doctor could not be contradicted by non-expert evidence (a concession not justified in view of the holding of the court in *Arais* v. *Kalensnikoff*, 10 Cal. (2d) 428 [74 P. (2d) 1043, 115 A. L. R. 163]), the premise on which he based it (the presence of a virginal hymen) could be so contradicted. It was contradicted, assuming his expert opinion to be correct and again excluding the possibility of a ceasarean birth, by all of the testimony which led the trial court to its finding of maternity.

We conclude that the decree appealed from finds substantial support in the evidence and it is accordingly affirmed.

Nourse, P. J., and Spence, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 14, 1942.