[Civ. No. 14647.   First Dist., Div. Two.   Oct. 25, 1951.]

Estate of ORESTE MONTICELLI, Deceased.   MAE KUENZI, Appellant, v. GIOVANNI NOCIARO et al., Respondents.

Abraham Setzer for Appellant.

Louis Ferrari for Respondents.

GOODELL, J.—In proceedings for a declaratory judgment and to determine heirship, also on final distribution, the court found that a bequest of $5,000 to Antonia Cataldi, then deceased, was distributable to her seven children, six of whom are respondents herein. The appeal is from the judgment and decree which so determined.

Oreste Monticelli died on September 16, 1946, leaving a holographic will which, as closely as it can be reproduced in print, reads as follows:

"(Will)

"8-30-33

"In case of my Death all my Property and cash go to Mrs Mae Kuenzi 124 Pope St San Fracisco California.

"Wit[?]h 5.000.00 Dollas to be sent to Antonia Cataldi (Mother)

her maden name. Offida Prov di Ascoli Piceno Italy.

Oreste Monticelli"

It will be noted that the words "San Francisco," "dollars" and "maiden" are misspelled. And in the first word of the second paragraph we have inserted a question mark between the letters "t" and "h" to indicate pen strokes difficult to decipher. Appellant claims that the word was meant to be "wish," misspelled "witsch," but the court made a finding that it was meant to be "with."

The court found that Antonia Cataldi was the mother of the testator. Had the finding been to the contrary there would have been no ground for an appeal since she predeceased the testator and the legacy would have lapsed in the absence of kinship between him and her (Prob. Code, § 92).

The first question is whether that finding is supported by substantial evidence. Appellant contends that it is not. Respondents, claiming that it is, rely on the fact that the testator wrote "Mother" under the name Antonia Cataldi, and they cite *Pearson* v. *Pearson,* 46 Cal. 609 in support of their position that "(Mother)" in the will is competent evidence that Antonia was the testator's mother. In that case at page 628 et seq., the court discusses and quotes several English cases, including *Whitelocke* v. *Baker,* 13 Ves., 514 where Lord Eldon said: "Declarations in the family, *descriptions in wills,* descriptions upon monuments, descriptions in Bibles and registry books, all are admitted upon the principle that they are the natural effusions of a party who must know the truth, and who speaks upon an occasion when his mind stands in an

even position, without any temptation to exceed or fall short of the truth.'' (The italics are the Supreme Court's.) It is interesting to note that in volume V of Wigmore on Evidence (3d ed.), section 1482, the author quotes the same statement with the comment that ''The sentence of Lord Eldon's in *Whitelocke* v. *Baker* has become the classical passage on this subject.''

Respondents cite other California cases on the same point but there is no need to discuss them since appellant in her closing brief has not questioned either the authorities or the rule which they announce. Her only comment is that the testator did not declare in so many words that Antonia was his mother, or write out ''to my mother $5000.'' The will was written in short terms, and whether '' (Mother)'' written under Antonia's name was the same as a declaration that she was testator's mother, was a question for the trial court. The word, in the way in which it was written, certainly furnishes a substantial basis for the inference that the testator intended to so declare and it is to be presumed that the court gave it that weight.

There is another important piece of evidence respecting testator's maternity. Appellant and testator were in business together and she was leaving San Francisco on a trip and wanted to transfer to him a bank account which stood in her name. Her testimony on cross-examination was as follows:

''Q. Did you accompany him to that branch of the American Trust Company? A. No.

''Q. You didn't go with him? A. No, I took the card and had him sign it for me.

''Q. You took the card? A. Yes.

''Q. On the card it asked for his mother's maiden name, did it not, as a method of identification. A. Yes, that is it.

''Q. And he wrote on that card the name of Antonia Cataldi as his mother's maiden name? A. Yes.''

Further: ''Q. And in his conversations with you, didn't he tell you that his mother's name was Antonia Cataldi? A. No, any more than the first—that was the first and only time I ever really knew what his mother's name was, so when I asked him for his mother's maiden name—when I asked him for his mother's name for the bank, that was the only time I knew what it was.''

There is still further evidence on the question of maternity. Oreste was born on August 30, 1887, at a town near Rome. The next day he was ''intrusted'' to a foundling home by the

office of the Department of Vital Statistics of the Commune. The record names him as Oreste Monticelli and characterizes him as illegitimate. Eleven days later "he was intrusted to a certain Antonia Cataldi, wife of Bernardino Nociaro, resident of Castorano." The documents do not show that the child was ever returned there.

The "family tree" of the Nociaro family (an official document entitled "Situazione di Famiglia") shows that Oreste lived in that family and household. It does not appear how long he lived there.

In a column headed "Father-Mother" it shows the Nociaro children as sons and daughters of Bernardino and Antonia, and Oreste Monticelli as "unknown" and, under "Relationship," it shows him as "boarder and roomer."

Respondents rely on these facts as evidence from which an inference could be drawn that Oreste was Antonia's son. They rely particularly on the fact that she took him from the home when he was 11 days old, into her own family, where according to the official "Situazione di Famiglia," he lived as one of them. They cite in that behalf *Estate of Connors*, 53 Cal. App.2d 484 [128 P.2d 200].

Appellant, on the other hand, relies on the following facts: the certificate of Oreste Monticelli's birth reads "father and mother unknown" and contains the recital "There does not appear any marginal notation relative to marriage" and the records of the foundling home show that he was enrolled or registered therein as illegitimate. When he was 19 he was called for service in the Italian army and his call describes him as "Oreste Monticelli, parents unknown." Three years later his honorable discharge recites "Son of, unknown." Appellant also relies on the fact that in the "family tree" he is described as merely a boarder and roomer in the Nociaro household.

The declaration in the will, as we have seen, is a well-recognized medium of proof of relationship. In itself it would seem to be sufficient to support the finding.

Appellant's testimony respecting the declaration on the bank's signature card that the maiden name of testator's mother was Antonia Cataldi, would likewise seem sufficient, without more, to sustain the finding.

Antonia's taking of the 11-day old child from the foundling home into her own family and keeping him there is evidence from which the inference could be drawn that she was reclaiming her own offspring.

All this evidence when taken in combination, makes a showing more than sufficient to support the finding.

The evidence relied on by appellant created a conflict in so far as the court could have drawn the inference that Antonia's act in taking the infant from the home might have been merely an act of charity toward the abandoned child of some other woman rather than an act inspired by a natural, maternal feeling for her own child. The evidence with respect to illegitimacy, however, creates no conflict, for notwithstanding the child might have been born out of wedlock he could of course still be Antonia's.

■ In our opinion there is substantial evidence to support the finding that Antonia Cataldi was Oreste's mother. In such event her death during his lifetime would not cause her legacy to lapse if she left lineal descendents (Prob. Code, § 92). And her children are named in the "Situazione di Famiglia" in evidence herein.

■ Appellant's principal contention is that the $5,000 provision is not an outright bequest but merely a precatory recommendation which is not binding on her. This contention brings into the case the question whether the disputed word is "with" as found, or "wish" as claimed.

The question presented for decision does not turn on the court's finding on that issue, but is much broader because even such words as "I wish," "I desire," "I request," are held to be mandatory and dispositive in certain circumstances. In other words, assuming that the testator wrote "wish," as appellant contends, it would be every bit as effective in making an outright bequest *if used in direct reference to the estate,* as if he had used "I give and bequeath."

In *Estate of Collias,* 37 Cal.2d 587 [233 P.2d 554] (July 24, 1951), the court says: "As a guide to the determination of the intent of the testator, the courts have stated certain general principles. Thus in *Estate of Lawrence,* 17 Cal.2d 1, 7 [108 P.2d 893], it was said that '. . . when words of recommendation, request and the like are used in direct reference to the estate, they are *prima facie* testamentary and imperative, and not precatory. While the desire of a testator for the disposal of his estate is a mere request when addressed to his devisee, it is to be construed as a command when addressed to his executor.' And again in *Estate of Miles,* 72 Cal.App.2d 336, 343 [164 P.2d 546], it was said: 'A wish or request of the testator for the disposition of his estate directed to the executor is a command, but if addressed to the legatee

it will not be construed as a limitation on the estate given in absolute terms. (*Estate of Marti,* 132 Cal. 666, 671 [61 P. 964, 64 P. 1071].)' To the same effect is *Estate of Tooley,* 170 Cal. 164 [149 P. 574, Ann.Cas. 1917B 516]."

In the Collias case a clear-cut devise and bequest left the entire residue to Collias' nephew who was also named as executor. But when the testator came to considering his relatives in Greece he said "It is my desire and wish that my nephew . . . will give half of my estate to my nearest relative heir in Greece" for the latter to divide among all Collias' close relatives in Greece. The court points out that, while the nephew was both residuary legatee-devisee and executor, the direction to him was as nephew and devisee, not as executor. It was the devisee who was asked to give half of what had been willed to him. The Collias case is a perfect illustration of the rule which prevails when the direction is to the beneficiary respecting his devise or bequest, while *Estate of Tooley, supra,* illustrates the rule which prevails when the direction is to the executor (if one is named) or the language is "used in direct reference to the estate."

In the present case (as in *Estate of Tooley* and *Estate of Mayne,* 28 Cal.App.2d 340 [82 P.2d 504]) no executor was named, and, unlike *Estate of Collias,* no expression of a wish or desire was directed to the person to whom the bequest or devise had been made. In *Estate of Shirley,* 180 Cal. 400, 403 [181 P. 777], the court said: "The fact that the clause here involved is not formally addressed or directed to any person as one by whom the bequest should be set aside is of no importance. Where words are used which dispose of property or impose a condition upon a bequest given elsewhere in the will, they need not be addressed to anyone. It is enough that they show the intent and will of the testatrix regarding the property or legacy. If they do this, the court and the law will carry it out by probating the will and distributing the estate as is provided therein."

If it be assumed, as appellant strenuously contends, that the $5,000 provision opened with "wish" or, better still, "*I* wish," instead of "with," the second paragraph would read:

"I wish $5000.00 dollars to be sent to Antonia Cataldi (Mother) her maiden name" etc. It would then parallel the will in *Estate of Tooley,* which in its entirety read: "I give all my property at my death to my daughter Logan Mattie Tooley. If at her death she has neither husband or children

I desire any property that may be left divided equally among my sisters and brother.'' The two wills are parallel for several reasons. First, in each there was a clear and distinct bequest and devise in the first paragraph. Second, in each the second paragraph is not *in terms* addressed or directed to anyone. Third, in neither was an executor named. Fourth, the second paragraph in each contains no words such as ''I bequeath'' or ''I give,'' but one says ''I desire'' and the other ''I wish.'' Fifth, the Tooley will does not *in terms* specify who is to ''divide,'' and the present will does not *in terms* specify who is to ''send.'' The only difference between the Tooley and Monticelli wills is that in the former the division of the property (a) depends on conditions and (b) is postponed, while in the latter no condition is attached and there is no delay.

On the authority of *Estate of Tooley,* 170 Cal. 164 [149 P. 574, Ann. Cas. 1917B 516], and *Estate of Mayne,* 28 Cal.App. 2d 340 [82 P.2d 504] (which, also, is a parallel case) the language of the second paragraph of Monticelli's will must be held to have been ''used in direct reference to the estate,'' hence it was mandatory and effected a testamentary disposition.

Appellant points to the fact that Monticelli named no executor. From this premise it is argued, by process of elimination, that the provision that $5,000 is ''to be sent to Antonia Cataldi'' must have meant that *she* was to send it— that the request was directed to her and not to the executor, or administrator, or the court, or estate. In *Estate of Shirley, supra,* at pages 402-3 the court points out that the phrase ''addressed to the executor'' is used ''only as a convenient form of expression'' and as the equivalent of words of request ''used in direct reference to the estate'' (citing *Estate of Tooley*). For this reason the fact that no executor was named is of no importance.

This brings us to the ''wish'' versus ''with'' controversy. In the findings the court quoted the will, underscored the disputed word, and then found: ''That the fourth letter in the above underscored word 'wit-h' occurring between the 'T' and 'H' is illegible. That the deceased intended said word to denote 'with' and to make said bequest . . . to his mother whose maiden name was Antonia Cataldi, mandatory, and that said mandatory direction with regard to said legacy was a mandatory direction to the administrator with the will annexed and not to the residuary legatee.''

Appellant contends that the finding is not supported by the evidence.

Respondents in their brief quote at length the familiar language of *Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689], in support of their argument that the finding, based on substantial evidence, "is impervious to attack on appeal." Appellant in her closing brief does not attack this rule but does argue that the evidence was overwhelming that the testator not only knew how to spell the word "with" but could write it legibly. The testator worked in the drug and chemical business and had a formula book with numerous entries therein containing the word "with" in his own handwriting. This book was in evidence and is before us. The argument that the entries in the book demonstrated that testator had a perfect command of "with," was one properly to be addressed to the trial court, but the fact remains that although the testator knew how to spell and write "with," he did not, in this important instance, write it legibly (whether because of an unsteady hand or what not—incidentally the numerals "8" and "30" in the date are none too steady or legible). We are satisfied that there was substantial evidence to support the finding. Moreover as said earlier the question whether the word is "with" or "wish" is not the turning point of this case.

In *Estate of Collias* the testator after giving the entire residue to his nephew expressed his wish and desire that the nephew "will give half of my estate to my nearest relative heir in Greece." This furnishes the key for distinguishing the authorities on which appellant relies, all of which are cases where the testator called on the beneficiary to do something for somebody out of property which the beneficiary has received. Thus in *Estate of Miles*, 72 Cal.App. 2d 336 [164 P.2d 546], testator requested his wife to give his daughter $500 and his son $100. *Estate of Cook*, 58 Cal.App. 2d 376 [136 P.2d 338] followed *Estate of Marti*, 132 Cal. 666 [61 P. 964, 64 P. 1071] and *Estate of Goldthwaite*, 140 Cal.App. 551 [35 P.2d 1050]. In the Marti case testator's wife and executrix was asked to make a will leaving to his relatives half of what she had received. (See *Estate of Kearns*, 36 Cal.2d 531 [225 P.2d 218], and *Estate of Collias*, *supra*, for the rule where the request is made to one who is both executor and devisee.) In the Goldthwaite case the testator asked his father to give to a third person half the proceeds of the sale of a

piece of real estate which he had devised to the father. *Estate of Budd,* 166 Cal. 286 [135 P. 1131]; *Estate of Farelly,* 214 Cal. 199 [4 P.2d 948]; *Estate of Sowash,* 62 Cal.App. 512 [217 P. 123] and *Estate of Lee,* 104 Cal.App. 15 [84 P. 948] are not in point.

The judgments and orders appealed from are affirmed.

Nourse, P. J., and Dooling, J., concurred.

A petition for a rehearing was denied November 24, 1951, and appellant's petition for a hearing by the Supreme Court was denied December 20, 1951.