Edward Don & Company, a Corporation, Irene K. Don, et al., Plaintiffs-Appellants, v. Pearl Don Ufland, et al., Defendants-Appellees.

Gen. No. 50,007.

First District.

September 11, 1968.

Rehearing denied October 18, 1968.

Arvey, Hodes & Mantynband, of Chicago (Sidney R. Zatz, G. Gale Roberson, and J. Herzl Segal, of counsel), for appellants.

Albert E. Jenner, Jr., Thomas P. Sullivan, Muller Davis, and Jack A. Cohon, of Chicago (Raymond, Mayer, Jenner & Block, of counsel), for appellees.

MR. PRESIDING JUSTICE SMITH delivered the opinion of the court.

The question is simple. Who are the officers of Edward Don & Company, a corporation, and who owns the corporate stock? The answer must be found in a thicket of testimonial and documentary diction, fiction and contradiction arising out of 97 trial days, a record of over 8,500 pages, and exhibits in excess of 2,000. On November 13, 1957, the plaintiffs met and elected directors and officers on the theory that they as individuals were the owners of a majority of the corporate stock. On the same day, the defendants elected directors and officers of the corporation on the theory that a family partnership owned 100% of the stock and that they constituted a

majority of such partners. The plaintiffs promptly filed their complaint alleging that the defendants were unlawfully acting as officers and directors of the corporation and sought an injunction restraining the defendants from acting as such officers and directors and likewise restraining any interference with the plaintiffs as officers and directors. All collateral issues have been resolved and settled by agreement between the parties and an agreed order entered except as to the two issues here presented. The defendants answered th complaint and filed a counterclaim alleging that the purported issuance of stock to individuals was abortive, a sham and without any legal force whatsoever. The trial court so held and found that the family partnership was the owner of 100% of the stock of the plaintiff-corporation and that the stock purportedly issued to the individuals was null and void. A decree so finding was entered and the suit of the plaintiffs for an injunction was dismissed for want of equity. The plaintiffs appeal.

Edward Don, the husband of the plaintiff-Irene and the father of the plaintiffs, Richard and Daniel, founded the business in 1921. The defendants are brothers and a sister of Edward, who entered the business from time to time as they completed their education, beginning in 1921 through 1927. The business progressed from an individual proprietorship doing business as Edward Don & Company to a partnership and then to a corporation. The company manufactured nothing, operated as a restaurant supply house and grew from a $16,000-a-year business into a multimillion-dollar corporation. The record is clear that Edward, as the founder and the oldest member of the family, was the patriarch, the leader, the bellwether sheep, and it is fair to say the dominant and dominating individual in the business until his untimely death on February 11, 1956. It was he who made the decisions and directed the operation of the business. Dur-

ing this period, as between themselves, there is an atmosphere of hard work, honesty, integrity, diligence, mutual respect and confidence in each other. In this atmosphere and on this record, it is not even debatable but that each of the parties occupied a fiduciary relationship one with the other. Rizzo v. Rizzo, 3 Ill2d 291, 120 NE2d 546. The juridical marathon that we now review does not result from an intentional or malevolent breach of that fiduciary relationship by anyone. The controversy has its origin in a policy persistently practiced before and after Edward's death of showing one picture of the family business organization in the privacy of the family and presenting an entirely different picture of the family organization to creditors, loaning agencies, advertisers, tax agencies and the public generally. Expediency was the watchword when any problem arose with a minimal if not an almost total lack of legal direction and guidance prior to Edward's death and for awhile thereafter. This has in no sense retarded the growth and the development of the corporation nor has the policy thus pursued in any manner adversely affected any in the business world with whom the corporation dealt. It has, nevertheless, created an evidentiary and documentary swamp which we now explore for some solid ground for the corporate ownership.

From the entry of Julius into the business in 1921, it was conducted under the apparent sole proprietorship of Edward. His individual income tax returns were prepared and filed on that theory. From its inception, however, the brothers and sisters were on a salary, plus a profit-sharing plan, and the profits not required for individual personal living were ploughed back into the business as working capital. Annually the amount ploughed back into the business by each individual was represented by a treasury note signed by Edward and later by Edward and Dave. It is clear that all parties during this period acquiesced in and consented to this arrangement.

52

Whether these treasury notes created a debtor-creditor relationship or a partnership between Edward and his brothers and sister is now more or less immaterial. In 1946, this practice brought Edward Don & Company into a head-on conflict with the wartime Wage and Stabilization Board because Edward's personal income tax returns showed salary increases to his brothers and sister in violation of the Wage Stabilization Act.

A partnership agreement dated January 1, 1947, was formalized and submitted to the Wage and Stabilization Board to establish the fact that the business operation was a partnership. In reliance upon this contract, the Government settled the Wage Stabilization Act violation with a savings of some $75,000. In lieu of his individual returns previously filed, Edward filed partnership returns for the business for the years 1942–1945, showing the earnings of the business as an income of the partnership, the date of origin of the partnership as 1922, and the partners as Edward and the defendants. This partnership contract provided in substance the following:

1. Appointed Edward Don as sole general manager with authority to operate the ventures of the partnership under the apparent ownership of Edward Don personally, *"whenever necessary, but for the benefit of all the partners,"*

2. Provided for 3% interest to be paid on the capital accounts of the partners for the sums ploughed back into the partnership by each partner,

3. Provided that wherever the assets were assigned or transferred in whole or in part, the division between the partners would include not more than 48% of the total to Edward Don individually, and that the remaining should be distributed proportionately to the other partners, or their legal representatives pro rata,

4. That if Edward Don died or ceased to be connected with said business owning more than 48% of the business, his executors or administrators would transfer that

amount over 48% to the remaining partners pro rata according to the respective percentage of the then remaining partners, or if such division was not practicable, then to the said partners jointly as tenants in common,

5. And that "the purpose of the above paragraph is to make impossible the dictatorship of any partner's widow, or widower or any heirs and their attorneys."

In their answer to the counterclaim, the plaintiffs charged that this agreement is not a true, correct or accurate picture of the agreement, but was prepared for the express purpose of justifying the payments heretofore made to some of the defendants and to neutralize the charge that the company was in violation of the Wage Stabilization Act. Expedient though it may have been, the cold fact remains in this record that this contract saved the business a substantial sum of money and whatever may have been the interests of the partners at this time, they all profited by it. They cannot enjoy its fruits and repudiate its terms. Either it was devised to knowingly mislead the Government or it was fairly, intentionally and honestly entered into. We conclude the latter and in so doing suggest that good conscience, simple equity and common honesty dictates this conclusion.

This experience triggered the thought that the business should be incorporated—a suggestion which had been made for some time by Goldfine, the company auditor, and the internal revenue agent who had been assigned to this account. This was accomplished notwithstanding the fact that Julius, Pearl and Sam testified they were not consulted about nor did they participate in the decision to incorporate, but learned about it some months later. Their statements are torpedoed by the fact that the corporate charter was issued by the State of Illinois on April 14, 1947, and their genuine signatures appear on the application for that charter.

On May 1, 1947, the operating assets of Edward Don & Company, a partnership, were transferred to the corpora-

tion and on that day, Stock Certificate 0 for 500,000 shares at $1 par value was issued to Edward Don & Company, a partnership. The record shows that this was a bona fide dollar for dollar transfer of assets from partnership to corporation. About this time, Edward discussed with his auditors the question of breaking up Certificate 0 and making stock distributions to the individual partners for estate planning purposes. Both sides agree that Rootberg, one of the auditors, advised against it at this time for the reason that the proposed distribution suggested by Edward was at a variance with the capital account and profit account owned by each party and thus the danger of tax consequences was present. Five years later, the same subject was brought up and under date of September 18, 1952, a memorandum concerning Federal gift tax and Federal estate tax was prepared and forwarded to all members of the partnership. By an assignment dated April 30, 1952, the partnership assigned Certificate 0 with all partners signing the transfer and the certification at the bottom that the transfer of the shares did not constitute a sale. In conformity with the specific terms of that assignment, Certificates 1–6 were then issued as follows:

| Certificate 1 | Edward Don and Irene Don<br>310,000 shares (62%) |
| Certificate 2 | Julius K. Don and Charlotte Don<br>50,000 shares (10%) |
| Certificate 3 | Sam Robert Don and Esther Don<br>50,000 shares (10%) |
| Certificate 4 | Meyer Don and Eva Don<br>30,000 shares (6%) |
| Certificate 5 | David Don and Nora Don<br>30,000 shares (6%) |
| Certificate 6 | Pearl Don Schneiderman<br>30,000 shares (6%) |

In 1954, the corporation was in need of cash. The two banks who were financing the corporation insisted that the corporation's indebtedness to the partnership be eliminated. Accordingly, Stock Certificate 107 for 55,000 shares at $3 was issued to "Don Bros. Management and Investment Company." That partnership paid $10,000 cash to the corporation and canceled notes of the corporation for an aggregate of $155,000. In December, 1955, this certificate was assigned to the same parties as had been Certificate 0 with the same percentage and with Edward receiving 34,100 shares, Julius 5,500, Sam 5,500, Meyer or Mike 3,300, David 3,300 and Pearl 3,300. Certificate 107 was actually completed after Edward's death on February 11, 1956. That certificate and the breakup Certificates 108–113 were actually completed by using facsimile signatures of Edward and Pearl. We cannot fail to observe, however, that the percentages used were identical with the breakup of Certificate 0. Financial statements to the financing banks signed by the individual stockholders after Edward's death reflected the stock ownership of the individuals to be as set forth above. At this point, it is easy to conclude that the plaintiffs were the majority stockholders and entitled to elect directors and officers of the corporation.

In this whole record, about the only transaction that stands unsullied and unspotted under the brightness of the noonday sun is the incorporation of Edward Don & Company and Certificates 0 and 107. Actually Certificate 107 is slightly tainted as it carries the authorized signatures of nobody. It was completed after Edward's death by the auditors without authority by using a facsimile signature stamp of Edward and Pearl. Neither side questions the integrity of either of these two certificates. We therefore remove the discoloration of 107 by use of the equitable doctrine that that which should have been was done. Thus Certificates 0 and 107 were honest certifi-

56

cates and the shares of stock represented by each were originally owned by the family partnership.

The integrity of these two certificates and the stock represented by them provides a solid foundation for the organization and the operation of the corporation to the date of Edward's death. Irrespective of assignments, transfers and technical stock ownership, no one questions this result. At a meeting held in Irene Don's apartment on February 17, 1956, just six days after Edward's death, Irene, Richard, Daniel, Julius, Sam, Dave, Pearl, and Eva, the wife of Mike who was then ill, appeared. This group selected Irene, Richard, and the five defendants as the Board of Directors. The Board met and chose Julius as chairman, Dave as president, Mike, Irene and Richard as vice-presidents, Pearl as secretary, and the business of the corporation was thereafter conducted with these officers in charge. They steered the corporate ship through the financial crisis immediately following Edward's death. At this time, the atmosphere of hard work, honesty, integrity, diligence, mutual respect and confidence in each other which had permeated the family enterprise over the years was still present. The posture of all was then for the best interest of the corporation and its future. In the aftermath of the unexpected death of their leader and its possible impact upon the financial structure of the corporation, all present at the meeting voted, without any inhibition, for the welfare of the corporation—and, perhaps for the last time, unshackled by misunderstandings, misgivings, or personal individual financial motivation. The owners of a vast majority of all outstanding stock were present and voted for such officers. These officers in our judgment are still the officers of the corporation unless superseded by others in a lawful manner.

■■ Under the pleadings in this case, we must now turn to the breakup of Certificates 0 and 107 to de-

termine whether they conceal rather than reveal the proper equitable ownership of this corporation. This we may do. In Tilley v. Shippee, 12 Ill2d 616, 623, 147 NE2d 347, 352, the Supreme Court said:

> ". . . the trial court, in the exercise of its equitable powers, can penetrate behind the screen of a corporate entity or other forms of business in order to apply the equitable maxim that equity will look through the forms to the substance of a transaction in order to ascertain the relationship of the parties. (Caprillo v. O'Hara, 400 Ill 518, 81 NE2d 513) . . ."

When Certificate 0 was issued, the auditors inquired as to whether it was going to be broken up into individual ownership. Edward suggested a division with the dollar-wise value comparable to the percentages in which Certificates 1–6 were actually issued. The auditor then stated that to do so would possibly involve tax consequences under the Internal Revenue Code of 1939 for the simple reason that the capital accounts and the profit accounts of the individuals were at a different ratio than the proposed stock issue ratio. The auditors suggested that a period of five years elapse before any stock distribution to the individuals. Edward acquiesced. It seems perfectly reasonable to conclude that Edward was thus fully aware that his proposed breakup of Certificate 0 was not in accordance with the several percentage interests of the parties in the partnership and would involve a taxable capital gain to him. Five years passed—Certificates 1–6 were then issued at Edward's direction, but pursuant to an assignment signed by all. After his death, the auditors completed Certificates 107 and 108–113 with facsimile signatures in the same ratio as had been used in Certificates 1–6.

When the corporation was organized and the physical assets of the operating partnership were transferred to that corporation in exchange for Certificate 0 and later

Certificate 107 was issued, it is clear that the equitable ownership of the stock represented by these certificates should have been in direct ratio to the amount that each partner then owned in the capital assets of the operating partnership on the day of the respective transfers of partnership property to the corporation. The stock became an asset of the partnership in lieu of and replaced other physical assets of the operating business. The ownership of the one should have been in the same ratio as the ownership of the other. Edward knew this; the auditors knew this, everybody knew this. The split up of these certificates did not conform to this pattern. When Certificates 1–6 were issued, Edward's deficit balance in the partnership capital accounts was $143,457.-76. A like situation existed when Certificates 107 and 108–113 were issued after his death, except that Edward's deficit balance had now increased to $202,211.34. All the others had a credit balance after payment for the stock issued in their respective names. One naturally wonders how this can be and volumes of the evidence on both sides in this case represent attempts to reconcile the irreconcilable and refute the irrefutable.

The plaintiffs invoke the doctrine of estoppel and the doctrine of unclean hands against the defendants. To invoke either or both of these doctrines on this record brings us dangerously close to the brink of a stalemate. Our only possible course, therefore, was to run this entire record through the wringer in the hope that what is left will enable us to reach a conscionable result. The defendants are charged with a conspiracy of silence in not making available to the plaintiffs the true facts of the corporate enterprise and thus they have dirty hands and are now estopped to make known the facts. It is clear that Goldfine and Rootberg both knew at the time of the incorporation that Certificates 1–6 did not reflect the respective interests shown by the records, that Edward also knew this, and that either Edward or Goldfine

persuaded the brothers and sister to "go along." Shortly after Edward's death, Goldfine testified that he and some of the defendants had a discussion in which they suggested that he sit down and explain to Irene, Richard, and Daniel the true situation. Goldfine testified that on an occasion or two, he tried to do that and "then I found that Irene did not seem to want to listen to me. I can't tell you why." Both David and Mike spoke directly to Richard and Irene about it and advised them that the stock record book did not show the truth of the matter nor the respective ownerships. This testimony is not denied by either Irene or Richard. Mike talked to Irene about it and when Irene started to cry, the conversation ended. Richard told David that they would stand on the stock record book and that was all that amounted to anything. There can be little doubt but that the plaintiffs were well aware of the fact that there was a dispute, that the matter ought to be investigated and that they deliberately closed their ears to any explanation. In addition all of the original partners signed the 1947 contract upon which the settlement with the Wage Stabilization Board was founded. Plaintiffs, now standing in the shoes of their ancestors, state in their pleadings that this purported partnership agreement is not a true writing of any agreement between the parties at that time, but was a "document prepared for the purpose of justifying certain payments theretofore made by the enterprises then operating as Edward Don & Company in order to overcome objections by the United States of America." This contract, they assert, was in force only during the war years. They refer to agreements dated in November 1945, as representing the true agreement between the parties and that these superseded the 1947 agreements. It is difficult for us to see how a 1945 contract can supersede a contract dated January 21, 1947. The 1947 agreement certainly purports to be otherwise. Yet the plaintiffs seem perfectly willing to toss it aside as a sham

and to indict their husband and father and all of the defendants with deliberate misrepresentations and, albeit, a legal fraud on the United States Government. A court of equity ought not condone such conduct. We don't. Perhaps the strict application by us of either the doctrine of estoppel or the doctrine of unclean hands to all parties in this case would be to freeze us into total immobility. We elect not to be frozen. We prefer to wash their hands for them and act. We choose to conclude that the doctrine applies to neither side and that they are both bound by the 1947 contract.

It should again be noted that in the 1947 contract permission was given to Edward to show personal proprietorship *"whenever necessary, but for the benefit of all the partners."* The defendants had followed his lead for more than 30 years—they had never been betrayed and could reasonably believe that they never would be. His statements to the auditors indicate he never intended it otherwise. Edward's untimely death undoubtedly precluded just that. Be that as it may, this record thoroughly establishes that Certificates 1–6 were never intended to reflect the true and precise ownership of the corporate assets. On the day prior to Edward's death, Goldfine was preparing the partnership return showing the ownership of the stock in the partnership at the close of the year 1955. At this time, Certificates 91–114 were not signed and some of them had not even been typed. Goldfine, Rootberg and Harold Levison (all internal auditors of the corporation) obtained a rubber facsimile of Edward's and Pearl's signatures as president and secretary, respectively, and one or the other of them signed all of these certificates with such facsimile rubber stamp. At this time, they also made entries in the partnership general journal and general ledger purporting to remove the stock of Edward Don & Company as a partnership investment and reducing the partnership capital accounts by $665,000. They then conformed the 1955 tax return

61

to the records as thus changed showing the stock already issued to individuals. Thus came into being a new picture as to records and tax returns. The reason for this is best explained by Goldfine's testimony as abstracted. "[He] Edward told the banks that the stock of the company was in the hands of the partners. However, the partnership books did not reveal that, and when he died we had a session, almost I think on the day he died, with Phil Rootberg, Harold Levison, and we thought it would be the proper thing to make these entries on the books in order to keep his word with the bank. The man was gone, and we deemed it advisable at that time to do so and we proceeded to do it."

From 1952 to 1956, they didn't make the entries—a failure said by the plaintiffs to be inadvertence on the part of the auditors. This is pure fiction. The auditors knew Edward was representing to the banks that he owned more than 50% of the stock, that the stock certificates were all in the stock record book and not in the physical custody of purported stockholders, and that they had been told not to deliver the stock. Because of Edward's death, the credit status of the company was dubious and the auditors no doubt honestly recognized the danger of the banks refusing credit if the true facts were now known. They told David of their plans and they "thought it was good business and good conduct" and "the wise thing to do." David merely said, "if you think it is the right thing to do, do it." David signed the 1955 partnership return without any discussion or examination nor was he then aware that it did not reflect the stock as a partnership asset as the prior returns had. Goldfine testified that it was customary for the partners to accept and sign a document he prepared without question. He testified "they just signed if I told them to sign." The foundation for new bank financing following Edward's death was under way. Financial statements of the individuals on a bank form were prepared and showed

individual ownership of the stock. Julius and Sam protested that the reflection of their ownership of the stock was incorrect. Goldfine testified that he told them that could be straightened out later—that we had to have these individual statements on account of the credit relationship with the banks and they went ahead and signed it because "they had a lot of faith in me." The same thing happened so far as Dave was concerned. The financial statements signed by Meyer and Pearl did not even contain the page showing the ownership of the stock.

At the suggestion of Irene's attorney, an indemnity agreement was prepared by Levison which recited the opening sentence: "The parties hereto are the principal stockholders in Edward Don & Company, an Illinois Corporation, that the interests of the parties in the corporation were not equal and that the loss if any in guaranteeing the bank loan including interest shall be borne by the parties hereto in 'direct proportion to their respective interest in the said Edward Don & Company, an Illinois Corporation.' " Sam protested the agreement and stated that he had more stock in the corporation. Levison pointed out to him however that the indemnity agreement did not set out what amount of stock was in his or anybody else's name. There is little or nothing inconsistent in signing this agreement as all were members of the partnership and either through it or individually in fact were the shareholders of the corporation. The bank insisted upon a copy of the partnership agreement—none could be found. (The 1947 contract showed up later.) Accordingly, in 1956, Levison drafted a new partnership agreement. The defendants testified that this contract was intended to apply only to partnership assets other than stock in Edward Don & Company, i. e., to the nonoperating assets of the investment company. The plaintiffs, of course, can hardly avoid this conclusion for the reason that the corporation was an operating company and if at the time of the contract the stock

63

in that company was owned by individuals, as they claim, it obviously could not be an asset of the partnership investment company. If the stock was individually owned as plaintiffs claim, there was no occasion for a partnership contract that related to anything except noncorporate assets. In any event, this document, like so much in this record, was an expediency utilized to induce the banks to extend credit and without which the whole boat was in danger of catastrophic floundering. So far as individual stock ownership is concerned, it is evidence of little or nothing except that the signatories to it, in the aggregate, owned all the controlling stock in the corporation either through the partnership or individually in unspecified proportions. It preserved the integrity of Edward with the banks, presented a nice "showcase" to the bank and accomplished its purpose for the benefit of all. The loans were made and in a few months paid, and the ship, as well as the shipmates, were all back safe in quiet financial waters again. This conduct was, we think, neither unclean hands nor estoppel as to any of the parties, but the practical exercise of the customary family practice of practical expediency.

Prior to and after the incorporation of the company, the capital investment of each of the partners was reflected by a treasury note signed on behalf of the partnership. Annually these notes were adjusted to reflect the withdrawals of the various partners, their share of the profits, bonuses, etc. The old notes were marked paid and new notes executed. In 1952, each note showed a deduction of each partner's account for the purchase of the corporate stock. Edward's note did not show a sufficient capital balance for the purchase of the 310,000 shares and instead indicated a deficit of $143,457.76. The others had a credit rather than a debit balance and this suggests that the 62% of the stock represented by Certificate 1 was considerably in excess precentagewise of Edward's then interest in the business. It is further noted that in

the partnership income tax return for the year 1952, after the issuance of Certificates 1–6, Edward signed the partnership return showing that at the end of the year that partnership still had a $665,000 investment in the corporation. The same condition is reflected for 1953 and 1954 with these two latter returns signed by David Don. During this same period, Edward was representing to the banks that he was the owner of in excess of 50% of the corporate stock, whereas the three partnership returns reflect that his interest, together with that of his sons, Richard and Daniel, was less than 40%. The explanation for these contradictory positions follows.

When David, Julius, Sam, and Meyer saw the proposed percentage in the breakdown of Certificate 0 into 1–6 and the deductions on their treasury notes, they asked Goldfine about it and stated that the stock certificates did not represent correctly their interests in the corporation. Goldfine testified that he spoke to Edward about it and was told not to worry about it "when the time will come, I will straighten it out, I've always treated the boys right." Goldfine also testified that he had conversations with Edward with reference to removing the stock certificates from the stock record book and distributing them. Goldfine testified "he told me it was none of my business, to go about my business, and take care of the auditing and he would take care of the boys." All of the stock certificates were still in the stock record book at the time of Edward's death, and it is so stipulated between the parties. David, Julius, Sam, and Meyer all talked with Edward about the stock certificates and told him it did not reflect their correct interests in the business and neither did the notes. Edward told them in substance that he was trying to work out a deal for a public offering of the stock, or a merger with some other company, and it was necessary for him to show that he had complete control of the business. He also told them that in order to borrow money at the bank, it was neces-

sary to show the banks that he had a controlling interest in the business so that if a default was made, it could be cared for without asking anybody else about it. He further told Mike not to worry about it when Mike had difficulties with Richard and a fight ensued. Mike expressed the feeling that it would be difficult to get along with Richard, and Edward then told him that the stock certificates did not represent the correct ownership in the business and not to worry about Richard for the simple reason that his family would never have over 48% of the business and never have control (note that the 48% is referred to in the 1947 contract). He represented that in any deals he would make for a public offering or for the sale of the business or for a merger of the business, it was necessary that he have apparent authority to consummate that deal without consulting anyone. The plaintiffs urge that these are statements of a dead man and should be scrutinized with care. The status of this testimony has been rather aptly stated as follows:

> ". . . This evidence, which uncorroborated might have been regarded as the lifeless bones of an unarticulated skeleton, was given flesh and contour by the other facts in evidence, undisputed and unimpeached." In re Connors' Estate, 53 Cal App2d 484, 128 P2d 200, 203.

The partnership investment records show the ownership of this stock in the partnership and had done so from 1947. The partnership income tax returns likewise reflected this condition and continued to do so up to and after his death. Both the investment account and the partnership income tax reports tend to corroborate his statements to his brothers and to Goldfine and the Chancellor was correct in so concluding.

Having determined that Certificates 0 and 107 furnish a solid foundation for the election of officers im-

mediately following Edward's death, we turn now to the question as to if, when and how those officers and directors were ever superseded. Fundamental is the fact that stock certificates are muniments of ownership in the property of a corporation and documentary vehicles for the transfer of such ownership. The break down of Certificate 107 by the auditors through the use of facsimile signatures is without authority, without justification, with knowledge that the percentage amounts were in dispute and carry on its face the bar sinister. They are a nullity. We conclude therefore that the 55,000 shares represented by Certificate 107 an honest certificate, are owned by the partnership and not by individuals and are controlled by the 1947 contract.

The original partnership was terminated by operation of law with Edward's death. A new contract creating a partnership between his heirs and the surviving partners was prepared and executed effective February 11, 1956. The record establishes that this contract did not in any way apply to operating assets, but rather to nonoperating assets and "the business of managing businesses and making investments." The two 1945 contracts to which reference has been made segregated the operating assets from the investment assets of the family enterprises. The testimony clearly establishes that the 1956 contract was not intended to apply to the operating assets, and indeed this position is clearly consistent with the position of the plaintiffs throughout that the stock in the corporation was individually owned. We have already indicated that the 1947 contract superseded the 1945 contract as to operating assets. It therefore follows that the 55,000 shares of stock are controlled by the 1947 contract and under it at no time could Edward or his estates or assignees ever have more than 48% of the operating business. In this state of the record, the plaintiffs fall far short of establishing that their rump election

of officers was conducted with a majority of the stock represented and it is and it was therefore a nullity and accomplished nothing.

We think a like result obtains so far as the defendants are concerned. Acting on behalf of the 1947 partnership, they voted the 55,000 shares of stock. They undertook to vote the 500,000 shares of stock represented by Certificate 0. We do not agree with the trial court that Certificates 1–6 were a sham or a complete nullity. Rather they were certificates issued for a specific purpose to meet a specific situation and are valid to the extent that they effectively accomplished that purpose. All parties joined in transferring Certificate 0 into the six certificates numbered 1–6. They are in our judgment bound by this action. They made innumerable subsequent transfers of their respective interests and exercised dominion and control over the stock represented by such certificates. None of the certificates in question were ever delivered to the respective transferees, none were ever removed from the stock record book and there is no evidence that the respective transferees ever actually knew that they had such ownership prior to Edward's death. The keeping of all such certificates in this and other enterprises with the business records was a consistent practice of the several enterprises and unquestioned by the several owners. To permit the surviving partners to completely repudiate these transactions and vote the stock in totality as partnership property is to judicially create a whirlwind of legal problems, tax problems, and consequences wholly unwarranted by this record. We therefore hold that the rump election of the defendants was likewise a nullity, elected no officers and/or directors and did not supersede the election held in February, 1956.

Frey v. Wubbena, 26 Ill2d 62, 185 NE2d 850, 855, dealt with the creation of joint tenancies in stock certificates

and other interests. Certificates 1–6 created joint tenancies. In that case, the Supreme Court said at page 70:

> "We do not mean to imply that where joint ownership is set up in conformity with the statutory provisions, a court of equity is thereby foreclosed from looking behind the form of the transaction and determining questions of real and beneficial interest as between the parties. . . ."

It was there held that the registration of stock ownership upon the books of the corporation in proper statutory language is sufficient to vest legal title subject nevertheless to divestments if the circumstances surrounding the transaction warrant it. In interpreting this holding, the court observed in Lytle v. Northern Trust Co., 39 Ill App 2d 372, 377, 188 NE2d 743, 745, that the reference to divestment relates ". . . to the preservation of those forms of equitable relief afforded in cases involving a confidential relationship, fraud, undue influence, *the investiture of nominal title for the purpose of convenience,* and situations of like character." (Emphasis supplied.) We have already observed that we have here present a confidential relationship. The in-depth and exhaustive analysis of the circumstances surrounding these certificates contained in the Chancellor's opinion clearly establishes that they were certificates of convenience and thus we may look behind the veil to ascertain whether or not these certificates represent the true ownership of the corporate property and in what proportions. For reasons previously stated, we have legitimated Certificate 107 but treat its progeny as stillborn.

The plaintiffs rely basically upon the stock registration book of the corporation and this is admittedly prima facie evidence of ownership, but is not conclusive. All of the partners joined in the transfer of Certificate 0 into Certificates 1–6 and the named transferees were

designated by them. The corporation had been in operation for five years. Thirty percent of its profit was at all times retained in the corporation and even today remains undistributed. That thirty percent should follow the actual ownership of the corporate stock. The plaintiffs at no time before Edward's death participated in any partnership meetings and have never then regarded themselves as having any interest in the partnership assets which were transferred to the corporation. If Certificates 1–6 represented the true interests in the corporation, there would be little point in this litigation. Edward knew that they didn't—Goldfine knew that they didn't—Rootberg also knew that they didn't—those who are now the surviving partners were protesting and plaintiffs refused to listen to or accept any explanation. The fact that as certificates of convenience or necessity they served those purposes does not mean that they reflected at any time the proper ownership of the corporate assets in the individuals. With the exception of Edward, all of the owners of these certificates were charged on the books of the partnership with their dollar value. The transfer of the stock to Edward transposed him from a creditor to a debtor of the partnership—and the only one. We see little foundation for the claim that Certificates 1–6 legally or equitably accurately reflect the true ownership of the individual interest in the corporation assets. The Chancellor elected to treat them and their progeny as stillborn. We do not deem this necessary. We prefer to regard them as valid to the extent that they knowingly transferred actual interest in the corporate assets.

The income tax returns, the journal and the general ledger investment records of Don Bros. Management and Investment Company, a partnership, reflected the ownership of the corporate stock in the partnership. Subledgers, work sheets and so called "area of agreement" document reflected the individual status of the partners. Using several methods of computations, the Chancellor

concluded "thus, in short review, we find by one method of calculation the probable interest of Edward at the time of the split was 34.74%—or over a period of years—using the same hypothesis, that it could be as high as 39.09%; that by statutory method, it would be as low as ⅙th or 16.06% and by the agreement of 1947, limited in all events to 48%." Edward selected arbitrarily the figure of 62% and directed the issuance of Certificates 1–6 accordingly. By joining in Certificates 1–6, all of the partners acquiesced in the issuance of the stock in this fashion. We have previously discussed the purposes. These facts do not militate against the proposition that all of these partners occupied a fiduciary relationship. In Rizzo v. Rizzo, 3 Ill2d 291, 302, 120 NE2d 546, 552, the court stated:

". . . even though the deed was absolute on its face, it is clear from the understanding of the parties, and from the nature of Michael Rizzo's fiduciary obligation, that this property should be deemed to be held for the benefit of the firm, and was properly found to be partnership property."

No matter what Certificates 1–6 may show on their face, it is thus abundantly clear that the individuals were effectively removing this stock from the partnership as an operating operation for the many reasons we have already discussed. Divided in 1952, it was controlled by the partnership contract of 1947. Each certificate holder by virtue of his or her interest in the partnership was the owner of the property for the benefit of all. To the extent therefore that each certificate represented the actual percentagewise share of each of the partners in the partnership, it was a valid conveyance and likewise the progeny of each certificate is valid to that extent and to that extent only. The Chancellor could not and neither can we from the records before us determine with precision the proper individual interest in the corporation and an accounting for that purpose is necessarily required

71

in accordance with sound general accounting principles. When so determined, then the 30% reserved, together with the earnings of the corporation, must follow a like distribution wholly separate and distinct from bonuses or salaries properly paid during the course of the corporation operation. To hold otherwise and treat this stock as still owned by the partnership is to invite a rerun of this litigation to dissolve the partnership, nullify the purposes in which all parties acquiesced and particiated and destroy the interest, if any, that transferees from the several beneficial owners now have without such owners being parties to this litigation. The 1947 contracts provided specifically what was to be done with the operating assets of the supply company upon the death of Edward. Nothing remains to be done except to carry out the terms of that contract as stated therein. To do so requires only a determination of the percentage interest of the respective partners and to conform and deliver the certificates of stock to them properly reflecting such interest and to recognize transfers by them up to but not exceeding such actual interest.

One other matter deserves comment. Plaintiffs filed a motion for new trial before another judge for the reason that the court consulted two accountants separately about general principles of accounting prior to his final opinion and this, they say, is a denial of due process. The record contains a long explanation by the court, the examination of the two accountants by defendants, the refusal of plaintiffs to examine them and the failure of this record to show that either side was prejudiced by the action. The questions asked were hypothetical, the name or parties to the case were not disclosed and no factual issues were discussed. There is nothing which suggests any improper motives, any influence on the decision and certainly nothing that has affected this court's determination. Plaintiffs were not denied due process. They were offered the cup and refused to drink.

They can't complain of being thirsty. As we view it, the result in this case is wholly unaffected by principles of accounting. On remand generally accepted principles of accounting will determine the interests of the parties in the capital stock. The plaintiffs fall far short of showing any prejudice to them as a result of these consultations nor were they denied the opportunity to show it. Under these circumstances, plaintiffs have "failed to establish prejudicial error." People v. Wilson, 24 Ill2d 598, 602, 182 NE2d 683, 685.

Accordingly, this cause is reversed and remanded to the trial court with directions to enter a decree providing in substance as follows:

I. That Certificate 0 and Certificate 107 are bona fide certificates representing the partnership assets transferred to the corporation at the time of their respective issuance and that from the date of each transfer, such property became the property of and subject to the control of the corporation;

II. That such transfers operated in law as a sale, transfer or assignment for a consideration suitable and agreeable to all the partners within the meaning of the 1947 contract and that the breakup certificate as required by said contract should "include not more than 48% of the total to Edward Don individually, and the remaining shall be distributed proportionately to the other partners hereto, or their legal representatives pro rata";

III. That Edward Don did remain connected with "said business or ventures or any of them" until the time of his death on February 11, 1956, and thus by its terms, the 1947 contract controls;

IV. That the officers and directors elected at the meeting on February 17, 1956, were duly and properly elected and still are the officers of said corporation;

V. That the percentage interest of each of the partners in the physical assets transferred to the corporation in consideration of Certificate 0 and Certificate 107 be

determined as of the time of the respective transfers, either (a) by the unanimous agreement of the directors or (b) in default thereof by an auditor employed by them and directed to determine such percentage interest in accordance with accepted accounting practices, or (c) if an auditor or auditors cannot be agreed upon that the court designate an auditor or auditors at the cost of the corporation to make such percentagewise determinations;

VI. That Certificate 0 and Certificate 107 be surrendered and in lieu thereof new certificates be issued to the partners properly reflecting their respective percentagewise ownership of the corporate assets;

VII. That subsequent derivative stock transfers having as their original ancestor Certificate 0 be recognized and validated by the corporation to the extent that the totality of such transfers by any transferor does not exceed his interest in the corporation as finally determined and to the extent that such transfer was authorized by the original partner-donor;

VIII. That previous interlocutory or permanent order designed to maintain the status quo and to effectuate the continued effective operation of the corporation and in particular the order of July 2, 1964, relating to the agreement of the parties as to their conduct under the decree pending appeal in lieu of the supersedeas be reaffirmed; and

IX. That the decree shall expressly retain jurisdiction of this cause for the purpose of giving direction to the officers as herein determined or to enforce such decree if necessary or appropriate.

Reversed and remanded with directions.

TRAPP and CRAVEN, JJ., concur.