ROBERT F. SHULTZ *et al.*, Plaintiffs-Appellants, v. DELTA-RAIL CORPO-
RATION *et al.*, Defendants-Appellees.

Second District   No. 2—85—0834

Opinion filed May 28, 1987.

Lloyd E. Dyer, Jr., of Wheaton, for appellants.

Rodney W. Equi, Keith E. Roberts, Sr., and Robert R. Verchota, all of Donovan & Roberts, P.C., of Wheaton, for appellees.

PRESIDING JUSTICE LINDBERG delivered the opinion of the court:

Plaintiffs, Robert F. Shultz (Robert) and Morris D. Davis (Morris), appeal from an order entered in the circuit court of Du Page County granting defendants', Delta-Rail Corporation, John D. Shultz (John), and Marie Shultz (Marie), motion to dismiss pursuant to section 2—619 (a)(9) of the Civil Practice Law (Ill. Rev. Stat. 1985, ch. 110, par. 2—619(a)(9).) The issue raised on appeal is whether the trial court erred in granting defendants' motion to dismiss based on affirmative matter capable of defeating plaintiffs' claims. We affirm.

The circumstances of this case are complex and are further complicated by the fact that the case involves an intrafamily dispute, and each side has a different version or interpretation of the underlying facts giving rise to the dispute. In 1962 Robert and his brother John formed the Delta Tube Corporation, which underwent a name change to Delta-Rail Corporation in 1966. Robert contributed two-thirds of the initial capitalization, and John, one-third. At the time of incorporation three stock certificates were issued: certificate No. 1, for 50 shares, issued to Robert; certificate No. 2, also for 50 shares, issued to John; and certificate No. 3, for five shares, issued to the brothers' father. Robert did not receive shares of stock proportionate to his contribution because he was involved in bankruptcy proceedings in connection with a precursor corporation, and Robert was a personal guarantor of its debts. The bankruptcy matter was eventually settled and Robert was appointed to the board of directors of Delta Tube. In 1964 stock certificate No. 4 for 50 shares was issued to Marie, John's wife, for no consideration, with the understanding that she was holding the certificate for the benefit of Robert, who at the time was still involved in the bankruptcy proceedings. Each brother has a separate version regarding the purpose of the issuance of certificate No. 4. Robert contends that certificate No. 4 was issued to reflect his true capital contribution to the corporation, i.e., 100 shares or two-thirds of the outstanding stock, while John had 50 shares or one-third of the stock. John's version is that certificate No. 4 was issued to replace certificate No. 1, and, therefore, as of that date Robert was left with no shares of stock. John stated that this action was taken because of Robert's 1966 divorce. As plaintiffs' brief notes, neither version is completely supported by the facts. According to plaintiffs' amended complaint, the record book of the corporation contains the statements

that certificate No. 4 was a transfer from John and also a transfer of certificate No. 1. John's version is contradicted by facts pleaded in plaintiffs' second amended complaint which state that *both* Robert and Marie participated as shareholders after 1964, *i.e.*, in 1966, 1971, 1972, and 1973. Robert's version is in conflict with the fact that the corporate annual reports and record book continued to list 112 shares as outstanding (John had received seven additional shares in 1964), even though the owners of certificates No. 1, 2, and 4 totalling 150 shares participated as shareholders.

In 1978 Robert requested that certificate No. 4 be transferred from Marie to himself. The transfer took place during a meeting at the office of attorney Keith Roberts, who at the time represented both brothers and the corporation. As a result of the meeting, an agreement was executed which transferred certificate No. 4 from Marie to Robert for no consideration. The agreement further stated that:

"The outstanding Common Stock Certificates in Delta Rail Corp as of this date [August 2, 1978] are as follows:

No. 2 - fifty (50) shares, JOHN D. SHULTZ

No. 3 - five (5) shares, FRANK A. SHULTZ [the father]

No. 4 - fifty (50) shares, ROBERT F. SHULTZ

No. 5 - seven (7) shares, JOHN D. SHULTZ"

This agreement does not mention certificate No. 1. When questioned on this issue at his deposition, John made the following statements:

"Q. [Plaintiffs' Counsel] Would you tell me everything that took place at the August 2 meeting?

A. Demand was made upon Robert Shultz for certificate number 1.

Q. Who made that demand?

A. Keith Roberts.

* * *

Q. What did Keith Roberts say?

A. He said Where is certificate number 1?

Q. That's how he made his demand?

A. Yes, to the best of my knowledge.

Q. Do you recall those words?

A. No, I don't recall those words.

Q. Then what happened?

A. Robert Shultz said Certificate 1 never existed.

Q. Said it never existed?

A. Never existed.

Q. What else was said?

A. After he refused the existence of certificate number 1, this agreement was typed up including paragraph 2. [recital of the outstanding stock] There was no argument about the fact."

In 1979 Robert and John entered into negotiations for the purchase of Robert's interest. An agreement was apparently reached by both parties but the scope of the agreement is in dispute. The record evinces the existence of the following documents: an "Agreement" dated September 25, 1979, for the sale of certificate No. 4 to the corporation at a price of $3,560 per share to be paid in installments over two years; an "Assignment" of certificate No. 4 dated September 25, 1979; an "Assignment" of certificate No. 1 dated September 25, 1979; an "Agreement" providing for the employment of Robert as an independent consultant dated October 1, 1979; and a "Mutual Release and Indemnification" dated October 3, 1979.

At his deposition, Robert testified that he executed an agreement for the sale of certificate No. 1 that contained the same provisions as for certificate No. 4. Installment payments on the sale of this certificate were to start in 1981 after the payments on certificate No. 4 had been completed. Robert testified that he signed the agreement for the sale of certificate No. 1 at the office of John's attorney. He claimed that the agreement for the sale of certificate No. 1 was never returned to him. This agreement is not part of the record on this case.

In his deposition, John testified that the agreement executed by the parties concerned the sale of certificate No. 4, since "Robert Shultz said (on August 2, 1978) certificate No. 1 did not exist." When asked why an assignment of certificate No. 1 was needed, John made the following statements:

"Q. Now, the agreement refers only to the purchase of certificate number 4, is that correct?

A. That's correct.

Q. Why is there no reference to certificate number 1?
***

[A] Because on August 2, 1978, Robert Shultz said certificate number 1 did not exist.

Q. Was there any discussion at all with reference to the transfer or sale of certificate number 1? When was that conversation?
* * *

A. Prior to the signing of the purchase agreement.
* * *

Q. What was said at that conversation?

A. Well, I did not believe that Robert Shultz did not have

certificate number 1, and that certificate number 1 and certificate number 4 were for the same share in the company, and wanted as much protection as what I could get.

That's why I insisted that he sign the 2 assignments of stock, which are in the purchase agreement ***. Robert Shultz signed for value received stock certificate number 1, Delta Tube, and stock certificate number 4 of Delta-Rail Corporation, both being the same certificate in terms of ownership.

* * *

Q. And can you explain why the purchase agreement does not refer to number 1?

A. Because Robert Shultz denied the existence of certificate number 1.

Q. That is the only reason?

A. Yes, Number 1 did not exist, according to Robert Shultz.

Q. Did you—your testimony is you insisted on receiving an assignment of number 1?

A. Because I did not believe him.

Q. Is there any reason why you did not insist that the agreement refer to number 1?

A. It does in terms of what he signed, as part of the package. It does refer to it.

Q. Where does it refer to the purchase agreement?

A. It does not in the purchase agreement."

The final installment payment on the sale of certificate No. 4 due on September 1, 1981, was withheld by John pursuant to a 90-day grace period provided for in the September 1979 agreement. On September 11, 1981, John through his attorney prepared and delivered to Robert a document entitled "Settlement of Agreement." The document provided that in consideration for purchaser's (the corporation's) agreement to waive the remaining time portion of the 90-day payment grace period such that the final payment would be tendered on September 11, 1981, the seller (Robert) would waive some of his rights under the original September 1979 agreement. The document further provided that the seller was to tender to purchaser stock certificate No. 1 or sign an "Affidavit," also prepared by John's attorney. Among other provisions the affidavit provided:

"3. Affiant [Robert] at the time of issuance of Delta-Rail Corp. Stock advised the corporation that said stock certificate number one of Delta Tube Corp. was lost.

4. Upon this representation, Delta-Rail Corp. issued to affiant Delta-Rail stock certificate number four for fifty (50) shares

of said corporation.

    5. Affiant warrants that:

       (a) That Delta Tube Corp. stock certificate number one is still missing.

       (b) That he has not nor will not transfer said certificate (if found) to any party for or without consideration."

Robert refused to sign either the "Settlement of Agreement" or the "Affidavit."

In June 1983, Robert filed a complaint seeking the replacement of certificate No. 1 pursuant to section 8—405 of the Uniform Commercial Code - Investment Securities (Ill. Rev. Stat. 1981, ch. 26, par. 8—405) on the ground that the certificate was lost in 1982 by Robert's stepson, Morris Davis (Morris), while Morris was in transit between Illinois and California. Robert further alleged that Delta-Rail had been informed of this event and that a proper request for replacement had been made and that Delta-Rail failed to respond. Robert's complaint was amended in June 1985 by the addition of counts II and III. Count II of the amended complaint alleged an equitable cause of action to protect Robert's equitable interest in Delta-Rail. In count III Robert alleged that defendants, John and Marie, conspired to defraud him of his interest in the corporation.

Defendants filed a motion to dismiss pursuant to section 2—619 (Ill. Rev. Stat. 1985, ch. 110, par. 2—619(a)(9).) The basis for the motion was that Robert had "released and waived all rights in ownership and operation of Delta-Rail," and therefore Robert's claim was "defeated by affirmative matter" contained in the August 2, 1978, and the September 25, 1979, agreements, the assignments of certificates No. 1 and No. 4, and the October 3, 1979, "Mutual Release." These documents were filed with defendants' motion to dismiss.

The trial court granted defendants' motion as to all counts of plaintiffs' complaint. This appeal ensued.

    ■ Plaintiffs first contend that the trial court erred in granting defendants' motion to dismiss count I on the basis that the court improperly applied the parol evidence rule. We disagree.

Section 2—619 provides in pertinent part:

       "Defendant may, within the time for pleading, file a motion for dismissal of the action or for other appropriate relief upon any of the following grounds. If the grounds do not appear on the face of the pleading attacked the motion shall be supported by affidavit:

            \* \* \*

    That the claim asserted against defendant is barred by other

affirmative matter avoiding the legal effect of or defeating the claim. (Ill. Rev. Stat. 1985, ch. 110, par. 2—619(a)(9).)

An "affirmative matter" within the meaning of this paragraph is something in the nature of a defense that either negates an alleged cause of action completely or refutes crucial conclusions of law or conclusions of material fact unsupported by allegations of specific fact contained in or inferred from the complaint. (*Consumer Electric Co. v. Cobelcomex, Inc.* (1986), 149 Ill. App. 3d 699, 703, 501 N.E.2d 156.) It does not include every statement of evidentiary fact which tends to negate allegations of the complaint; and a motion under section 2—619(a)(9) admits, for purposes of the motion, all facts well pleaded. *Glass Specialty Co. v. Litwiller* (1986) 147 Ill. App. 3d 653, 655, 498 N.E.2d 876.

Plaintiffs argue that the trial court erred in granting defendants' motion to dismiss on the basis that the documents attached to the motion did not constitute affirmative matter defeating plaintiffs' claims. We disagree.

The documents attached to defendants' motion consist of: (1) the August 2, 1978, agreement signed by Robert and John providing a recital of the outstanding stock certificates as of that date: (2) the September 25, 1979, "Agreement for Purchase of Corporate Stock," signed by John, on behalf of Delta-Rail, as purchaser and by Robert as seller; (3) an assignment to the corporation of certificate No. 1 signed by Robert and dated September 25, 1979; (4) an assignment to the corporation of certificate No. 4 signed by Robert and dated September 25, 1979; (5) a "Mutual Release and Indemnification" dated October 3, 1979, signed by John, Robert, Julia Shultz, and Marie.

Each document will be discussed individually as it pertains to this action. The August 2, 1978, agreement, which was executed as part of the transfer of stock certificate No. 4 from Marie to Robert for no consideration, specified that as of that date the outstanding Delta-Rail stock certificates were: (1) No. 2 for 50 shares belonging to John; (2) No. 3 for five shares belonging to Frank Shultz; (3) No. 4 for 50 shares belonging to Robert; and (4) No. 5 for 7 shares belonging to John. Certificate No. 1 is not mentioned.

The "Agreement for Purchase of Corporate Stock" provided for the sale of certificate No. 4 to the corporation by Robert "as owner of Delta-Rail Corp., *** certificate No. 4." The sale price was to be paid in four installments. The agreement contained the following pertinent provisions:

"9. Notwithstanding anything to the contrary herein, ROBERT F. SHULTZ shall have no duties as a Director, Offi-

cer, employee or *stockholder* of DELTA-RAIL CORP. effective as of the date this Agreement is executed between the parties as hereinafter provided.

\* \* \*

11. At such time as SELLER and PURCHASER have performed all obligations under the terms of this Agreement, SELLER, PURCHASER, and JOHN D. SHULTZ shall have no further rights or claims against each other.

12. In consideration of the mutual promises and understandings agreed to herein; all of the parties to this Agreement hereby *release and forever waive any right, claim or cause of action against the other parties of* any kind and character, *past and present, including, but not limited to, disputes between them arising from the ownership and operation of DELTA-RAIL CORP., and the relation of each of the parties to the other with regard to said ownership and operation.*" (Emphasis added.)

The "Mutual Release and Indemnification" provides in pertinent part:

"JOHN D. SHULTZ, MARIE SHULTZ, ROBERT F. SHULTZ, JULIA SHULTZ, DELTA-RAIL CORP. and DELTA TUBE CORP., \* \* \* for good and valuable consideration, receipt of which is hereby acknowledged by the other, HEREBY MUTUALLY REMISE, release, indemnify, save harmless and forever discharge the other, their heirs, executors, administrators, successors or assigns, of and from any claims, suit or causes of action, whether brought as a direct claim or indirectly by third persons, including, but not limited to an action filed in the 18th Judicial Circuit of Du Page County, \* \* \* or any debts, guarantees, dues, sums of money, accounts, reckonings, bonds, bills, specialities, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands, whatsoever, in law or in equity, which each now has against the other or ever had or which their heirs, executors, administrators, successors or assigns hereafter can, shall or may have, [up to the date of these proceedings]."

The trial court granted defendants' motion to dismiss based on the fact that plaintiff Robert had executed the release in connection with his ownership interest or rights in the corporation. The trial court found that the agreement between the parties was not ambiguous and, in fact, "absolutely plain on its face."

■■■ Plaintiffs argue that the trial court misconstrued the agreement in that it did not give effect to the intent of the parties and improperly applied the parol evidence rule. We are not persuaded by either of plaintiffs' arguments. Since a release is a contract, wherein a party abandons a claim to a person against whom the claim exists (*Costa v. Stephens-Adamson, Inc.* (1986), 142 Ill. App. 3d 798, 800, 491 N.E.2d 490), its construction is governed by the rules of law that prevail in contract cases (*Ainsworth Corp. v. Cenco Inc.* (1982), 107 Ill. App. 3d 435, 439, 437 N.E.2d 817). In the construction of contracts where no ambiguity is presented, the meaning of the agreement and the intention of the parties must be ascertained from the words employed therein (*Murphy v. S-M Delaware, Inc.* (1981), 95 Ill. App. 3d 562, 565, 420 N.E.2d 456), and the contract language is not rendered ambiguous simply because the parties did not agree upon its meaning (*Berutti v. Dierks Foods, Inc.* (1986), 145 Ill. App. 3d 931, 934, 496 N.E.2d 350). The determination of whether an agreement is ambiguous is a matter of law. *Tougy v. Twentieth Century-Fox Film Corp.* (1979), 69 Ill. App. 3d 508, 513, 387 N.E.2d 862.

■■ We conclude our examination of the release contained in the September 29, 1979, agreement that the trial court's finding of no ambiguity was correct. Therefore, no rules of construction need be applied. (*Murphy v. S-M Delaware, Inc.* (1981), 95 Ill. App. 3d 562, 565, 410 N.E.2d 456.) The court in *Murphy* cited with approval the following language from *Whiting Stoker Co. v. Chicago Stoker Corp.* (7th Cir. 1948), 171 F.2d 248, *cert. denied* (1949), 337 U.S. 915, 93 L. Ed. 1725, 69 S. Ct. 1155, regarding the principles used in deciding what constitutes ambiguity in a contract:

> " 'A contract is ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions; it is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends. 17 C.J.S., Contracts, Sec. 294, and case there cited. Contracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction.' " 171 F.2d 248, 250-51, quoted at *Murphy v. S-M Delaware, Inc.* (1981), 95 Ill. App. 3d 562, 565, 420 N.E.2d 456.

In this case, the September agreement provided for a release of "any right, claim or cause of action *** including *** disputes *** arising from the ownership and operation of DELTA-RAIL CORP." Plaintiffs argue that since the purpose of the agreement is the selling of certificate No. 4, and the agreement does not mention certificate

No. 1, disputes as to the ownership or disposition of certificate No. 1 were not contemplated within the scope of the release. The intention of the parties controls the scope and effect of a release; such intent is discerned from the language and the circumstances of the transaction. (*La Grange Federal Savings & Loan Association v. Rock River Corp.* (1981), 97 Ill. App. 3d 712, 716, 423 N.E.2d 496.) Plaintiffs' interpretation of the scope of the release is inconsistent with the language of the release itself, with the language of other provisions within the same agreement, and with other documents executed prior to and contemporaneously with the agreement. Another provision in the September agreement specified, *inter alia*, that Robert was to no longer have any duties as "stockholder" of Delta-Rail. Furthermore, in August 1978, Robert was party to an agreement specifying the outstanding certificates in the corporation, and certificate No. 1 was not mentioned. Parenthetically, we note that Robert may have been improvident by not inquiring as to certificate No. 1 between August 1978 and September 1979. We find that his argument that his continued ownership of certificate No. 1 is consistent with the documents relied upon by defendants in their section 2—619(a)(9) motion to be rather specious. Our conclusion regarding the scope of the September release is further supported by the comprehensive language of the October 1979 "Mutual Release and Indemnification" which extended to "any claim, suit or cause of action *** debts, guarantees, dues, sums of money *** contracts, controversies, agreements *** claims and demands whatsoever in law or in equity which each now has against the other or ever had." Plaintiffs contend that the October release dealt with a separate, unrelated legal proceeding. Such a contention is meritless given the fact that no express exemptions are provided for by the release. (See *Whitehead v. Fleet Towing Co.* (1982), 110 Ill. App. 3d 759, 442 N.E.2d 1362.) We, therefore, conclude that the language of the documents surrounding the September 1979 transaction does not support plaintiffs' argument, but rather it supports defendants' interpretation that the express terms of the September agreement and the other related documents preclude plaintiffs' claims asserted in this action.

Plaintiffs further argue that the trial court misapplied the parol evidence rule by not taking into consideration the documents prepared by John two years after the release. We disagree.

Plaintiffs contend that the existence of the 1981 documents is proof that the 1979 agreement did not constitute an "integrated" contract, and, therefore, it should not be interpreted so as to dispose of the issues related to the existence or ownership of certificate No. 1.

We find that the trial court did not err in not taking into consideration the 1981 documents to defeat the release.

■ Whether a particular dispute subject to negotiation has ultimately been embodied in a written agreement depends upon a determination of the intent of the parties. This intent is determined by examining their conduct, their language, and the context in which the document was drawn. (*Graebe v. Graebe* (1981), 95 Ill. App. 3d 1144, 1150, 420 N.E.2d 1095.) An agreement reduced to writing must be presumed to speak the intention of the parties who signed it. The intention with which it was executed must be determined from the language used, and such an agreement is not to be changed by extrinsic evidence. *Western Illinois Oil Co. v. Thompson* (1962), 26 Ill. 2d 287, 291, 186 N.E.2d 285.

Plaintiffs urge us to hold that the September 1979 agreement did not embody their intent to dispose of matters related to certificate No. 1, despite the comprehensive release language contained in this agreement. Plaintiffs base their argument on language from the Restatement (Second) of Contracts and on some related case law. Specifically, section 209 of the Restatement provides in pertinent part:

> "(1) An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.
>
> (2) Whether there is an integrated agreement is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule.
>
> (3) Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression." (Restatement (Second) of Contracts sec. 209, at 115 (1981).)

Comment *c* of section 209 is particularly pertinent to our case:

> "*Whether a writing has been adopted as an integrated agreement is a question of fact* to be determined in accordance with all relevant evidence. The issue is distinct from the issues whether an agreement was made and whether the document is genuine, and also from the issue whether it was intended as a complete and exclusive statement of the agreement." (Emphasis added.) (Restatement (Second) of Contracts sec. 209, comment *c*, at 116 (1981).)

Section 210 of the Restatement provides:

"(1) A completely integrated agreement is an integrated agreement adopted by the parties as a complete and exclusive statement of the terms of the agreement.

(2) A partially integrated agreement is an integrated agreement other than a completely integrated agreement.

(3) Whether an agreement is completely or partially integrated is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule." (Restatement (Second) of Contracts sec. 210, at 117-18 (1981).)

Plaintiffs specifically bring to our attention comment *b* to section 210:

"That a writing was or was not adopted as a completely integrated agreement may be proved by any relevant evidence. A document in the form of a written contract, signed by both parties and apparently complete on its face, may be decisive of the issue in the absence of credible contrary evidence. But a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties." Restatement (Second) of Contracts sec. 210, comment *b*, at 118 (1981).

Plaintiffs implicitly argue that the trial court should have taken into consideration the 1981 documents to determine whether the 1979 agreement was an integrated contract. Only after the court had made such an inquiry should it have applied the parol evidence rule. From our analysis of the Restatement, we conclude that the plaintiffs' argument is meritless. In interpreting the Restatement we are guided by the illustrations accompanying each section. The illustration accompanying comment *b* of section 236 indicates that the trial court should focus its inquiry into whether the contract is integrated on evidence "of the prior and contemporaneous conduct and language of the parties." Restatement (Second) of Contracts, sec. 210, comment *b*, illustration 1, at 118 (1973).

This interpretation is consistent with the court's reasoning in *Maas v. Board of Trustees* (1981), 94 Ill. App. 3d 562, 418 N.E.2d 1029. In *Maas* the court held:

"The authorities seem to be in accord in holding that all relevant evidence may be considered in order to determine whether a particular writing is in fact the complete agreement of the parties. *After* it has been determined that a particular writing is in fact the complete agreement, *then* under the "parol evidence rule" it cannot be altered." (Emphasis in original.) (94 Ill. App. 3d 562, 581, 418 N.E.2d 1029.)

The *Maas* court applied the principles it outlined above by focusing its inquiry on whether the contract in question was integrated on the events preceding the writing. See *F. W. Hempel & Co. v. Metal World, Inc.* (7th Cir. 1983), 721 F.2d 610

■ Application of the *Maas* reasoning and the Restatement to our case leads us to conclude that the trial court did not err in implicitly finding that the 1979 agreement was an integrated contract. The documents executed prior to and contemporaneously with the September 1979 contract support the interpretation that it expressed the parties' intent to dispose of all matters involving Robert's ownership interest in Delta-Rail. Therefore, any issues pertaining to certificate No. 1 were resolved by the release contained in the agreement. The trial court correctly refused to consider the 1981 documents, since they constituted parol evidence which would have varied the terms of the 1979 agreement. See *Main Bank v. Baker* (1981), 86 Ill. 2d 188, 427 N.E.2d 94.

In conclusion, we affirm the trial court's dismissal of count I of plaintiffs' second amended complaint.

■ Next, plaintiffs contend that the trial court erred in dismissing count II of their second amended complaint on the basis that this count, being for an equitable action, should not be affected by the release contained in the September 1979 agreement. We disagree.

In count II, plaintiffs allege, *inter alia*, that: (1) Robert contributed two-thirds of the original capitalization of Delta Tube; (2) the stock certificates issued to the other stockholders did not reflect their true percentage of ownership of the corporation and, thus, were "certificates of convenience" without legal force; and (3) since the September 1979 agreement, John has asserted the role of sole shareholder of the corporation and as such refused to recognize or allow Robert to participate as a shareholder (owner of certificate No. 1). Plaintiffs requested that the trial court enjoin John from acting as sole shareholder, appoint a receiver in order that the corporation be managed such that Robert's equitable interests be protected, and that an accounting be conducted leading to the issuance of new stock certificates reflecting each stockholder's proper percentage of ownership in the corporation.

Plaintiffs urge us to apply the reasoning and holding of *Edward Don & Co. v. Ufland* (1968), 98 Ill. App. 2d 49, 240 N.E.2d 725, to our case. In *Edward Don* the court stated that in a situation where, as here, the ownership of a corporation is rather difficult to determine because of an obfuscation, the court may determine whether "[the stock certificates] conceal rather than reveal the proper equitable

ownership of [the] corporation." (98 Ill. App. 2d 49, 57-58, 240 N.E.2d 725, 730.) The court arrived at this conclusion based on our supreme court's holding in *Tilley v. Shippee* (1958), 12 Ill. 2d 616, 147 N.E.2d 347:

> "[T]he trial court, in the exercise of its equitable powers, can penetrate behind the screen of a corporate entity *** in order to apply the equitable maxim that equity will look through the forms to the substance of a transaction in order to ascertain the relationship of the parties. [Citation.]" (12 Ill. 2d 616, 623, 147 N.E.2d 347.)

We agree with plaintiffs that reliance on *Edward Don* would be appropriate in this case, but plaintiffs' argument fails in view of the 1979 release. The 1979 agreement provided that Robert "release *** any right, claim or cause of action" against the corporation. We find no merit in plaintiffs' contention that this language does not cover the equitable cause of action asserted herein in view of the comprehensive language of the release.

We, therefore, conclude that the trial court did not err in dismissing count II of the second amended complaint. We note that plaintiffs do not argue that the release should be set aside to enable consideration of their equitable claim. Therefore, we need not address whether such action is either appropriate or necessary under the facts of this case.

■ Next, plaintiffs contend that the trial court erred in dismissing count III of the complaint for fraud. Based on our discussion above regarding the scope of the release as covering all causes of action against defendants, we conclude that the trial court did not err in dismissing count III.

In conclusion, we affirm the trial court's order granting defendants' motion to dismiss pursuant to section 2—619(a)(9) (Ill. Rev. Stat. 1985, ch. 110, par. 2—619(a)(9)).

Affirmed.

REINHARD and HOPF, JJ., concur.