**In re Garry WINER, Debtor.**

**Nos. 93 C 1056, 93 C 2138.**

United States District Court,
N.D. Illinois, E.D.

Sept. 10, 1993.

Kurt S. Lewis, Kurt S. Lewis, P.C., Denver, CO, David F. Heroy, Thomas C. Wolford, Neal Gerber & Eisenberg, Chicago, IL, for appellant.

Leonard M. Groupe and Bruce M. Katz, Groupe & Katz, Chicago, IL, for trustee.

Catherine Steege, Jenner & Block, Chicago, IL, for Winer.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

EF & G, Ltd. ("EF & G") has appealed from two orders entered by Bankruptcy Judge David Coar in the Chapter 7 proceedings involving debtor Garry Winer ("Winer"):

1. In the order that is now on appeal in Case No. 93 C 1056, Judge Coar ruled that EF & G's separate lawsuit against

Challenger Corporation ("Challenger")[1] violated the statutory automatic stay of all actions involving debtor Winer (Challenger itself is not in bankruptcy). Judge Coar's opinion in that respect, 149 B.R. 539 (Bankr.N.D.Ill.1993), will be cited "Opinion at —," referring to the page but not to the volume number in B.R.

2. In the order that is now on appeal in Case No. 93 C 2138, Judge Coar awarded $21,616.10 in damages to Winer and the Trustee of Winer's Chapter 7 bankruptcy estate ("Trustee").

Those appeals have been consolidated before this Court. For the reasons stated in this memorandum opinion and order, both of the Bankruptcy Court's orders are reversed.

### Facts [2]

Challenger, a computer software development business, was formed in 1983 by its president Winer. Its articles of incorporation authorize 30,000 shares of stock, but to date Challenger has issued only 1,000 shares, all owned by Winer. Challenger's lone asset of value comprises the rights to a MacIntosh-compatible desktop publishing program known as the Zeus Program, a program never actually distributed due to a dispute with a distributor.

On April 20, 1989 Challenger entered into a brief "preliminary understanding" (the "Agreement") with Daniel Benzaquen, Joel Cohen and Patrick Horan (the "Partners") to secure additional operating capital (Ex. 1 to this opinion). In return for their payment of $50,000 to Challenger, Partners were to receive a "twenty five percent (25%) equity position in Challenger," as well as the right to purchase "additional equity" for $25,000 per additional 7.5% of

the equity, "not to exceed a total investment of 40% of Challenger." By its terms the Agreement also stated it was to "serve as a basic understanding between the parties" and that it was understood that the Agreement "will be replaced by an official stock transfer agreement when the agreement is completed by Challenger's counsel and approved by Partners' counsel"—but that replacement document was never prepared. Nonetheless Partners paid Challenger the $50,000 (Complaint ¶ 7), and it is the nondelivery of Challenger's shares in exchange for that payment that has spawned the current dispute.

Next day (on April 21, 1989) Winer signed an even briefer document: a $50,000 one-year promissory note payable to Partners in the identical percentages in which they were to share their ownership in Challenger (44.3% to each of Benzaquen and Cohen, 11.4% to Horan). That instrument (the "Note," Ex. 2 to this opinion) recited:

In consideration of Zero percent (0%) interest, Garry Winer further promises to convey a twenty-five percent (25%) equity position in Challenger Software, per the preliminary stock transfer agreement dated April 20, 1989.

In this area there are multiple clouds of uncertainty—for example:

1. Was there a second $50,000 delivered to Winer personally, as to which the obligation of repayment was evidenced by the Note? Or did the Note rather reflect Winer's undertaking (in the fashion of a guarantor) to assure repayment of Partners' $50,000 investment in Challenger?

2. Relatedly, was Winer's quoted promise a commitment to convey part of

---

1. That action, Case No. 92 C 5795, is pending before this Court's colleague Honorable Harry Leinenweber. All the allegations in its Amended Complaint (the "Complaint") will be accepted as true for current purposes (though obviously this Court neither makes nor implies any factual findings in that respect).

2. Unfortunately the manner in which this litigation proceeded in the Bankruptcy Court, without any evidentiary hearing, left a number of factual issues unexplored. That has contributed substantially to the nature of the Bankruptcy

Court's opinion, in which the able Bankruptcy Judge explored a number of hypothetical byways—somewhat like the adventurers in the 18th century English novels (most often picaresque in nature and style) that sought to emulate the success of Daniel Defoe's works. What is set out here is uncontested by the parties, and fortunately the evidentiary gaps that will be referred to a bit later (though in some respects substantial) do not impair this Court's ability to resolve the present appeals.

his own Challenger stock (in which event it was at odds with Challenger's direct undertaking in the Agreement—and equally importantly, with the fact that Partners' $50,000 payment under the Agreement had been made to Challenger to provide *corporate* financing, and not to Winer outside the corporation)? Or was it instead a loosely-stated undertaking (again in the fashion of a guarantor) to assure that Winer's then-wholly-owned corporation Challenger would keep its promise in the Agreement?

3. Also relatedly, if Partners had indeed laid out one $50,000 payment rather than two, did the short-term repayment commitment by Winer indicate that the Agreement itself (despite its recital, for example, that "Challenger is interested in obtaining investment capital from Partners") contemplated that Partners were not in the conventional posture of a corporate shareholder—with an investment whose periodic yield and the ultimate recovery of whose capital amount were realizable only through dividends or sale of the stock or corporate liquidation? It is worth noting that the Agreement gave Challenger "the opportunity to purchase the stock back from Partners at any time" under several alternate formulations, a provision that renders even murkier the question of what was intended to happen to Partners' stock if they had in fact made only one $50,000 payment (that to Challenger) and if Winer had then performed on his commitment to make sure that Challenger repaid that amount within a year.[3]

But all of those things can be sorted out before Judge Leinenweber in the course of his adjudicating the merits of Partners' claim against Challenger. Most importantly for present purposes, they need not side-track this Court's resolution of these appeals (just as they need not have sidetracked the Bankruptcy Court's decision of the issues before it).

Partners' infusion of fresh capital into Challenger did not have the desired result. It was not too long before Challenger ceased operations for lack of revenue, and it was dissolved involuntarily on July 2, 1990, by the Illinois Secretary of State for delinquent franchise taxes and failure to file an annual report. No formal steps towards reinstatement have been undertaken (a subject dealt with later in this opinion), nor have there been any efforts to wind up Challenger's corporate affairs. Most critical to this litigation is that Challenger has never invoked the protections of corporate bankruptcy (while simultaneously subjecting itself to the correlative burdens). But Winer filed an individual personal petition in the Northern District of Illinois on October 19, 1990, seeking relief under Chapter 13 of the Bankruptcy Code. On November 28, 1990 his case was converted to a Chapter 7 proceeding and Leonard Groupe was appointed trustee ("Trustee").

Following the first meeting of creditors held in compliance with 11 U.S.C. § 341[4] on February 15, 1991, during which Trustee examined Winer as to his personal holdings, Trustee filed a "No Asset" report stating there was nothing of value in Winer's estate. Not long after that Winer, purporting to wear his hat as Challenger's President but without either consulting Trustee or seeking permission from the Bankruptcy Court, entered into an April 16, 1991 Letter of Agreement granting a license in the Zeus Program to Zeus, Inc. ("Zeus"). Then on October 22, 1991 Zeus filed in the United States District Court for the Northern District of California a law-

---

3. It is unnecessary to ring any further changes on the poorly-drafted April 1989 documents (a masterpiece of understatement)—what has been said to this point is sufficiently illustrative. This Court can only trust that the botch that those documents have made of matters (something that has since provided full employment for teams of lawyers in multiple arenas of litigation) is the result of the parties having been pennywise in entering into those documents without the benefit of counsel. If any lawyer or lawyers did play a role in the preparation of the two documents, it can only be said that Challenger is not necessarily the only participant in the drama that should have had its license to do business terminated.

4. All further citations to Title 11 provisions will take the form "Section —."

suit against an entity known as Quark, charging (among other things) infringement of the Zeus Program copyright.

After that suit was filed Quark's principals Fred Eberhimi and Timothy Gill formed EF & G, which paid $20,000 to buy out all of Partners' claims against Winer. EF & G then asserted the right to ownership of 25% of the equity in Challenger as well as the right to purchase an additional 15% in accordance with the Agreement. On February 18, 1992 EF & G successfully petitioned the Bankruptcy Court here to reopen Winer's bankruptcy case because the supposedly "No Asset" estate in fact had a valuable asset in the Challenger stock owned by Winer.[5]

Thereafter EF & G entered into negotiations with Trustee for the purchase of Trustee's interest in the Zeus Program. Initially EF & G offered $75,000 for that interest if Trustee could not succeed in avoiding the post-petition transfer of the Zeus Program to Zeus, or $150,000 if he could. When that offer was rejected the bidding grew more spirited—Judge Coar's opinion reflects that the ultimate offer reached the level of approximately $1.3 million!

Meanwhile, on June 24, 1992 EF & G once again attempted to invoke the Agreement, tendering to Trustee—on the premise that he was the person controlling Challenger[6]—a $50,000 cashier's check payable to Challenger for the purchase of the additional 15% of Challenger's stock. That request was denied by Trustee by letter the very same day, so EF & G then tendered the check to Winer's lawyer[7] on July 2 with a like demand directed to Winer as Challenger's President. It is hardly surprising—though it may very well have violated Winer's fiduciary obligations as a corporate officer—that Winer's lawyer, confronted with a demand that would dilute Winer's personal interest in Challenger, rejected it on July 14.

Meanwhile Zeus engaged in its own protective measures. It threatened to assert a major claim if either Trustee or EF & G acted to terminate its license of the Zeus Program. It then proceeded to counter EF & G's efforts by upping the ante (Opinion at 541):

> Zeus later presented its own offer which proposed to drop any claims that Zeus, Inc. might have against the estate and, if the Trustee would ratify the licensing agreement and join the copyright infringement suit against Quark as an additional party-plaintiff. To sweeten the pot and meet the EF & G offer, Zeus, Inc. also offered to modify the royalty provisions of the licensing agreement in a way which would pay to the estate amounts sufficient to satisfy the claims of the creditors of the Winer estate and leave money available for the equity holders in the event of a recovery in the California case.

After comparing the competing bids, Trustee decided that acceptance of the Zeus submission was in the best interests of Winer and his bankruptcy estate. Over

---

**5.** It will be remembered that EF & G's purchase from Partners included their right against Winer under the Note. That permitted EF & G to file a proof of claim in Winer's estate, in turn providing it with standing to seek reopening of the case.

**6.** Opinion at 541 is somewhat misleading in referring to that delivery as a request to "Trustee, as representative of Winer's estate," just as it is similarly misleading in stating that EF & G's next tender described in the text was "a similar request to Winer personally." In fact EF & G's Colorado counsel (who transmitted both the letter to Trustee and then the letter to Winer, in each instance together with the enclosed cashier's check payable to Challenger) was meticulous in stating (as the Opinion unfortunately

was not) that the claimed purchase of additional stock was from Challenger and *not* from Winer or Winer's bankruptcy estate.

**7.** Among the charges and countercharges of conflicting interests that have muddied the waters is one that Zeus is paying for Winer's lawyers' fees. *It seems as though only Bankruptcy Judge Coar and this Court, among all the players, are not subject to the claim that divided loyalties may be influencing the handling of this matter. To qualify that somewhat, Trustee may not be subject to such a contention, but as the later discussion reflects he certainly has not done everything possible that might have been expected from an impartial person arguably possessing powers with respect to Challenger.*

EF & G's objections to both that determination and to Trustee's legal authority to deal with the disposition of Challenger's assets, Judge Coar decided that solely for purposes of the hearing on the compromise of the dispute between Zeus and Trustee, the latter, "as representative of the estate of a shareholder in possession of the assets of a dissolved corporation, held those assets for creditors and equity holders of that corporation" (Opinion at 542). On July 27, 1992 Judge Coar entered an order approving Trustee's settlement with Zeus.[8]

On August 28, 1992 EF & G filed the action referred to in n. 1 (the "Challenger Action"), seeking (1) to obtain specific performance of the Agreement and (2) to enjoin Challenger from transferring its assets in derogation of EF & G's rights as a minority shareholder or in derogation of any other court-declared rights. Neither the Complaint there nor EF & G's Motion for Preliminary Injunction named Winer personally. Winer and Trustee responded by filing applications before Judge Coar for a rule to show cause against EF & G, claiming that the lawsuit violated Section 362's automatic stay.

After briefing but without an evidentiary hearing, on January 15, 1993 Judge Coar issued the Opinion, holding in part "that the relief sought by EF & G in the [Challenger] action violates the automatic stay imposed by § 362(a)(3) ... to the extent that it seeks to compel the transfer of any stock held by Winer" (Opinion at 546). Judge Coar also held that EF & G's claim for relief violated the automatic stay because it attempted to exercise control over the property of Winer's estate by interfering with Trustee's ability to transfer interests in the Zeus Program for the purpose of winding up Challenger's post-dissolution affairs (*id.*). Later Judge Coar awarded damages to Winer and Trustee arising out of the same proceedings. Those two decisions are the subject of the current appeals.

*Standard of Review and Issues Presented*

■ Bankruptcy appeals are governed by a dual standard of review. Bankruptcy Rule 8013 dictates that a bankruptcy judge's findings of fact cannot be set aside unless clearly erroneous, but his or her conclusions of law are to be reviewed de novo, as are mixed questions of fact and law (*Dacon Bolingbrook Assoc. Ltd. Partnership v. Federal Nat'l Mortgage Ass'n*, 155 B.R. 467, 470 (N.D.Ill.1993), citing *In re Ebbler Furniture & Appliances, Inc.*, 804 F.2d 87, 89 (7th Cir.1986)).

As already indicated, these appeals pose the two-faceted question whether EF & G's Challenger Action (1) to enforce the Agreement and (2) to enjoin the transfer of Challenger's assets violated the Section 362(a) automatic stay triggered by Winer's Chapter 7 bankruptcy proceedings. Those issues will be dealt with in turn.

*Attempted Enforcement of the Agreement*

This opinion must first determine whether EF & G violated the Section 362(a) stay when it sued Challenger to compel specific enforcement of the Agreement by which Challenger had agreed to convey up to 40% of its stock. EF & G insists that by its action it endeavored only to effectuate the acquisition of shares controlled by Challenger, a nondebtor entity, and not any of the shares contained in Winer's protected bankruptcy estate. In response Winer and Trustee contend that because Challenger, a dissolved corporation, was unable to issue any new additional shares, all of the stock to which EF & G might lay claim necessarily belonged to Winer. Thus, they say, any compelled transfer would violate the automatic stay.

It is beyond dispute that if enforcement of the Agreement would result in the delivery to EF & G of any of Winer's shares (now held by Trustee), such action would clearly run afoul of the automatic stay (*Club Assistance Program, Inc. v. Zucker-*

---

**8.** EF & G's appeal of that order to this District Court is currently pending before another of this Court's colleagues, Honorable James Holderman, in Case No. 92 C 7037.

*man*, 594 F.Supp. 341, 350 (N.D.Ill.1984)). If on the other hand EF & G is correct in its assertion that Challenger's and not Winer's stock is at issue, it is equally apparent that the stay against Winer would not be violated by EF & G's action to compel performance (Opinion at 542). Judge Coar sought to sidestep that issue by declaring that EF & G's action violated the stay "to the extent" that EF & G sought Winer's shares (*id.* at 546), declining to make any determination as to the extent (if any) that Winer's shares were in fact implicated by the Challenger action.[9]

Winer and Trustee strongly maintain that dissolved corporations can no longer issue stock (see, e.g., *Gamble v. Penn Valley Crude Oil Corp.*, 34 Del.Ch. 359, 104 A.2d 257, 260 (1954), holding that the power to wind up affairs does not include the right to issue additional stock under Delaware law). That may very well be true, but it is wholly irrelevant for two independent reasons.

First of all, one thing that struck this Court immediately on reading the papers here, but that mysteriously appears to have escaped everyone else involved in this litigation—EF & G (for whom the matter would have provided perhaps its most powerful argument on this issue), Winer and Trustee (one of whom has fiduciary obligations that should have been recognized and acted on) and the Bankruptcy Judge (for whom the point could have provided a ready answer to the Winer–Trustee argument in this area)—is the significance of the fact that Challenger's involuntary dissolution was triggered solely by minor procedural defaults: its nonpayment of franchise taxes and its nonfiling of an annual report. Every corporate practitioner with a modicum of experience well knows that those matters are readily and immediately

curable under Illinois law (805 ILCS 5/12.-45 [10]), and once cured it is just as though no intervening dissolution had taken place (BCA § 12.45(d)).[11] Whoever is entitled to act for the dissolved corporation (whether that is Trustee or, as this opinion later decides, is still Winer), it is frankly offensive for either of them to assert a claimed disability on Challenger's part when that disability (if it in fact exists) is within his power to eliminate so swiftly and easily.

But even apart from that, the argument that Winer and Trustee seek to fabricate in this respect carries no weight. It is a total non sequitur for them to argue that because Challenger allegedly lost the power to issue new shares upon its later dissolution, EF & G's attempt to enforce the Agreement necessarily seeks to acquire some of Winer's present shares.

After all, at the critical time—when the parties entered into the Agreement—Challenger incontrovertibly had the right to issue new shares that were authorized by its articles of incorporation. This opinion's *Facts* section has already explained that it is at least a plausible reading of the Agreement (indeed, at least on the surface it seems the more plausible reading) that Partners there contracted to acquire new Challenger shares, *not* 25% of Winer's holdings. And EF & G (Partners' successor under the Agreement) is entirely right in urging that the Challenger Action seeks relief *only* on that reading—if Challenger persuades Judge Leinenweber that Partners' (and hence EF & G's) rights run against Winer individually, EF & G must lose its case both on the merits and because of the Section 362 stay. Indeed, Judge Coar himself recognized precisely that (Opinion at 542 (citation omitted)):

**9.** In leaving that question unresolved, Judge Coar instead based his holding on the other grounds discussed below.

**10.** That cited provision is part of the Illinois Business Corporation Act ("BCA"). Further citations to that statute will take the form "BCA § —," which may readily be converted to the offi-

cial citation form by substituting "805 ILCS 5/" for "BCA §" in each instance.

**11.** Is this just another demonstration of the lesson—increasingly ignored in these days of specialization (or more accurately compartmentalization) in the legal profession—that it is far better to be a lawyer first and a litigator second than to be just a litigator?

If EF & G is seeking to assert possession of, control over, or an interest in those [Winer's] shares, then its actions in so doing violate § 362. If, on the other hand, the "preliminary understanding" contemplated that the shares to be issued were to come from authorized but unissued shares of Challenger, then this Court sees no reason why the automatic stay should be implicated under the facts of this case.

Two other points are worth making here. One responds to an absurd argument advanced only by Trustee, while the other deals further with Winer's and Trustee's contention about Challenger's inability to issue further shares, identifying another consideration that they should have recognized but plainly do not.

As to the first, Trustee Mem. 8 characterizes as "nonsense" the notion that the original 25% interest purchased by Partners or the potential 15% interest covered by their option to purchase applied to Challenger's authorized but unissued shares. That characterization is based on the need for Challenger to issue 333⅓ shares to Partners (which would then represent 25% of the total number of 1,333⅓ shares post-issuance). To the same effect, Trustee Mem. 8 labels as "more nonsense" the assumed intention for Challenger to issue an additional 166⅔ shares if Partners chose to exercise their rights to an additional 7.5% of the equity, or an additional 333⅓ shares for the full 15%.[12]

That need to issue fractional shares is the predicate for Trustee's contention that the shares agreed to be purchased pursuant to the Agreement were most likely those owned by Winer personally. But fractional shares are frequently encountered in corporate law as the consequence of reverse splits or of stock dividends.[13] And perhaps the most telling refutation of Trustee's less-than-specious argument is that the Agreement itself divided Partners' individual ownership shares by tenths of percentage points—so that if Trustee were correct that the potential for fractional shares negates an interpretation of the Agreement that would realize that potential, the parties could not have intended that Partners purchase Winer's own shares either.[14] No, it is Trustee's argument and not EF & G's that is "nonsense" and "more nonsense."

Finally, even if Challenger *were* unable to deliver the promised shares to EF & G, that would not necessarily block the Challenger Action. For one thing, the ancient maxim that "Equity considers that as done which ought to be done"[15] would surely appear to require Challenger to account to its two shareholders—Winer and EF & G—on the same basis as if the shares had in fact been issued to the latter. To put it another way, the Challenger Action's breach of contract claim can be satisfied—even without the issuance of shares—by a damage award measured by EF & G's contractual entitlement to corporate ownership, coupled with affording EF & G the same participatory rights that a minority shareholder would possess.

In summary, nothing advanced by Winer or Trustee derogates from EF & G's ability to enforce the Agreement against Challenger. Like Judge Coar, this Court confirms that right of enforcement (without

---

12. Trustee's math is as faulty as his logic. If Partners had exercised their option to acquire an additional 7.5% of the equity, bringing their total ownership to 32.5% (25% plus 7.5%), Challenger would need to issue an additional 148⁴⁄₂₇ shares—not 166⅔ as reported by Trustee—so that Winer's 1,000 shares would continue to represent his portion of the corporate pie (in that event 67.5% of the total).

13. To be sure, listed companies often create a market to sell or buy such fractional shares—but the point is that there is nothing unheard of about the fractional share concept as such.

14. If Partners had agreed to buy 250 shares from Winer (25% of his 1,000 shares), each of Benzaquen and Cohen would have bought 110¾ shares (44.3% of 250) and Horan would have bought 28½ shares.

15. For a recent reaffirmation of that principle, see *Cesena v. DuPage County,* 145 Ill.2d 32, 163 Ill.Dec. 911, 582 N.E.2d 177 (1991). And for an application of that maxim to cure a technical flaw in a corporate structure, see *Edward Don & Co. v. Ufland,* 98 Ill.App.2d 49, 56, 240 N.E.2d 725, 730 (1st Dist.1968).

expressing any substantive view on the ultimate success of that claim in light of the questions adverted to earlier in this opinion).

### Requested Injunctive Relief

It should be stressed at the outset of the second substantive phase of this opinion that EF & G is not here challenging the transaction with Zeus as such (that matter is pending before Judge Holderman). Instead, aware of the constraints that the automatic stay imposes on actions against Winer or on actions to obtain possession of or to exercise control over property of Winer's bankruptcy estate, EF & G seeks injunctive relief only against Challenger and the premature distribution of *its* assets. By paying insufficient heed to the integrity of Challenger—even a dissolved Challenger—as a corporate entity, Judge Coar's decision has impermissibly blurred what should be and is a bright-line separation under established law.

■ To set the stage for the analysis, the basic backdrop must be the principle (not questioned by the Bankruptcy Court) that Section 362(a) does not proscribe actions brought against nondebtor entities, even where there is a close nexus between those nondebtors and their bankrupt affiliates. That concept has consistently been confirmed and applied in a host of cases everywhere (exemplified in this Circuit by such cases as *Pitts v. Unarco Indus., Inc.,* 698 F.2d 313, 314 (7th Cir.1983) (per curiam) and *In re James Wilson Assoc.,* 965 F.2d 160, 170 (7th Cir.1992)). And the doctrine applies with equal force even where the nondebtor is a corporation wholly owned by the debtor (see, e.g., *Funding Systems Railcars, Inc. v. Pullman Standard, Inc.,* 34 B.R. 706, 709 (N.D.Ill.1983)).

■ Nor can that principle be subverted by manufacturing an exception, as Winer and Trustee would urge, based on the degree of control exercised by a majority-

shareholder or sole-shareholder debtor over the nondebtor subsidiary. Any such exception would swallow up the rule itself (see, e.g., the discussions in such cases as *In re Jones,* 121 B.R. 122, 124–25 (Bankr. M.D.Fla.1990)). Absent a piercing-the-corporate veil situation (and none is claimed to exist here), the debtor's presence in the bankruptcy court cannot block actions implicating the nondebtor subsidiary (see, e.g., such cases as *Funding Systems Railcars,* 34 B.R. at 709 and *In re Peoples Bankshares, Ltd.,* 68 B.R. 536, 538 (Bankr. N.D.Iowa 1986)). And importantly, the debtor cannot invoke the automatic stay just because the action against the nondebtor subsidiary will impact on the value of the debtor's stock (see, e.g., such cases as *Funding Systems Railcars,* 34 B.R. at 709 and *In re Hudgins,* 153 B.R. 441, 443–44 (Bankr.E.D.Va.1993)).[16]

Nor is this Court persuaded to override those principles of corporate integrity by the other cases on which Winer and Trustee rely: *In re MCEG Productions, Inc.,* 133 B.R. 232, 233–34 (Bankr.C.D.Cal.1991), which involved an obvious end run around the automatic stay, and *In re 48th St. Steakhouse, Inc.,* 835 F.2d 427, 430–31 (2d Cir.1987), where the automatic stay was held to extend to an action that—even though the debtor was not named as a party defendant—would directly destroy a valuable asset of the debtor's estate (its sublease from the nondebtor lessee whose prime lease was under attack). Quite apart from the substantively different situation in *48th St. Steakhouse,* the more broadly stated dictum in that case (in which the court spoke of "an adverse impact on property of the bankrupt estate," 835 F.2d at 431) cannot be taken in its literal sense to undo the uniform line of case law already referred to—it would prove too much. Judge Coar himself recognized that in his Opinion at 543.

---

**16.** All of the principles set out in this paragraph are also directly supported by a case on which Winer seeks to place heavy reliance (*In re Calvert,* 135 B.R. 398, 399–402 (Bankr.S.D.Cal. 1991)). Winer's effort to shape *Calvert* to his own ends is unpersuasive, for unlike this case the court action that was held to violate the automatic stay in that case had expressly joined the debtor as one of the named defendants (*id.* at 403–04).

In summary, neither Winer's status as a Challenger shareholder nor any of the consequences that flow directly from that stock ownership operates to curb EF & G's action to enjoin the potential dissipation of Challenger's assets until EF & G's own shareholder status has been resolved.[17] And that conclusion is not undercut by the concept of "unusual circumstances" voiced in *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.1986), where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." That limited identity-of-interests notion contrasts sharply with the cases (more comparable to this one) where application of the automatic stay has been rejected—in addition to the cases already cited in this opinion, cf. from our own Court of Appeals *In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 736–37 (7th Cir.1991) (though that opinion is framed in terms of modifying the automatic stay to allow an action to proceed, rather than dealing with the inapplicability of the stay as such).

Neither Winer nor Trustee can gainsay that EF & G has sued an independent corporate entity and that a judgment entered against Challenger would not be equivalent to a judgment against Winer personally. Those two entities maintain autonomous legal existences: Each is subject to a separate (although somewhat overlapping) set of creditors, Winer is not personally liable for Challenger's debts and both retain a privilege entirely independent of the other to determine whether or not to subject his or its assets to the benevolence (and bur-

dens) of the Bankruptcy Code. Winer has made such an election. Challenger has not.

That being the case, no legitimate reason exists to permit Winer to ignore the chosen form of Challenger's organization and to assert that its corporate interests are identical to his own personal interests simply because Winer now desires to repudiate the structure that he initially selected. Such an attempt to "reverse pierce" the corporate veil is clearly illegitimate (see, e.g., *In re Loughnane*, 28 B.R. 940, 942 (Bankr. D.Colo.1983) and *In re Lawler*, 50 B.R. 110, 117 (Bankr.N.D.Tex.1985)).

All of this is in a sense a prelude to the main event. Judge Coar really acknowledged the force of what has already been said here (as Winer and Trustee have not), for he predicated his application of the automatic stay on much more narrow grounds. Rather than focusing on the property in Winer's estate in the conventional sense, the Opinion concentrated on a very different interest that would be threatened by EF & G's injunction: Winer's purported right to wind up Challenger's corporate affairs, as to which BCA § 12.30(a) provides that dissolved corporations may carry on business necessary to wind up and liquidate business and affairs, such as collecting assets, discharging liabilities and distributing remaining assets among shareholders.

Judge Coar framed the issue in these terms (Opinion at 544):

There is no question but that on the date and time of filing the bankruptcy petition, Winer possessed the power and authority to wind up the affairs of Challenger. The question presented here is

---

**17.** That conclusion is further reinforced by an examination of the statutory backdrop against which Section 362(a) operates. As *Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 4 (1st Cir.1983) (emphasis added) has explained:

> We are persuaded by the reasoning of the Illinois Bankruptcy Court in *Royal Truck & Trailer, Inc. v. Armadora Maritima Salvadorena*, [10 B.R. 488 (N.D.Ill.1981)] and by a comparison of the stay provisions provided by Congress for a chapter 13 bankruptcy proceeding, which expressly include co-defendant debtors, with those provided for a chapter 11

bankruptcy proceeding, which make no mention of co-defendant debtors, that *had Congress intended § 362(a) to apply to solvent co-defendants, it would have said so.*

Accord, *In re F.T.L., Inc.*, 152 B.R. 61, 62 n. 2 (Bkrtcy.E.D.Va.1993)):

> Congress knew how to extend the automatic stay to nonbankrupt parties when it intended to do so. Chapter 13, for example, contains a narrowly drawn provision to stay proceedings against a limited category of individual co-signers of consumer debts. See 11 U.S.C. § 1301(a). . . .

whether that power to "wind up" became property of the estate.

As already indicated earlier in this opinion, the Bankruptcy Judge's affirmative answer to that question flows in substantial part from the Opinion's tendency to blur lines that are conceptually distinct. In part that has manifested itself by lumping together what EF & G accurately says are two separate issues: That power to wind up Challenger's corporate affairs could become part of Winer's bankruptcy estate, if at all, by way of either (1) his status as a shareholder or (2) his position as Challenger's sole officer-director. These two issues will be addressed in turn.

*Winer As Challenger's Shareholder*

■ Property of the bankruptcy estate is defined by Section 541(a)(1) as "all legal or equitable interests of the debtor in property as of the commencement of the case," a term that is to be interpreted broadly (*United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–05 & n. 9, 103 S.Ct. 2309, 2313 n. 9, 76 L.Ed.2d 515 (1983)). All parties agree that Challenger's status as an Illinois corporation means that Illinois law controls here, for state law determines property rights in bankruptcy cases (*Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–918, 59 L.Ed.2d 136 (1979)).

■ In that respect, Trustee Mem. 11 reflects the argument that is advanced by Winer as well as Trustee:

> The Trustee is the sole shareholder of Challenger, a dissolved Illinois corporation. The shares he holds entitle him to certain legal and equitable shareholder rights pursuant to the Illinois Business Corporation Act of 1983. Those rights, not just the actual shares themselves, are property to the estate and by virtue of § 541(a)(1) of the Bankruptcy Code

are protected under § 362(a)(3) of the Code.

But whether or not that would be so if Winer had indeed been Challenger's sole shareholder,[18] it glosses over the whole point of EF & G's unresolved Challenger Action: the fact that based on the rights established by the Agreement (or even by Winer's Note), Winer was *not* Challenger's sole shareholder. Thus the quoted contention relies on an impermissible bootstrapping that itself rests on an unfounded assumption.

That same defect infects the argument at Trustee Mem. 16 that BCA § 7.10 "provides a method by which the Trustee, as the sole shareholder (or at the very least, the majority shareholder) can exercise the power to effectuate the winding up of Challenger's affairs and the making of provision for the discharging of its liabilities." That statutory provision (entitled "Informal action by shareholders") is expressly limited to actions that are "required by this Act to be taken at any annual or special meeting of the shareholders of a corporation, or any other action which may be taken at a meeting of the shareholders." That purely procedural alternative to a formal meeting relates only to actions that *shareholders* (in contrast to directors or officers) are already otherwise permitted to undertake—it creates no *new* right on their part that would authorize the shareholders' winding up of Challenger's affairs.

Another argument, this one asserted at Winer Mem. 13, is similarly bogus—the contention that in "a closely-held corporation, the Debtor as its sole shareholder had the power to manage its affairs." Again that sole shareholder premise is invalid. And even were that not so, EF & G accurately points out that the statutory provision cited by Winer (BCA Art. 2A) simply does not apply because Challenger was not

---

**18.** Although this opinion need not ultimately resolve the question, it is far from clear that the rights that assertedly flow to Trustee from Winer's share ownership are indeed part of the bankruptcy estate. *Loughnane,* 28 B.R. at 942 does not really support the argument that intangible personal property rights flowing from the debtor's stock certificates are estate property.

Instead *Loughnane* concluded that those "intangible personal property rights" do not render "the corporate entity" property of the estate and that therefore the IRS did not violate Section 362(a) by acting against the property of the debtor when that agency proceeded against the nonbankrupt corporation in which the debtor was the 100% shareholder.

expressly organized under its close-corporation auspices (see BCA § 2A.05).

Even apart from the problems already identified, any notion that Winer's (and hence arguably Trustee's) status as a Challenger shareholder imports the right to wind up its corporate affairs would have to overcome the basic corporate rule that management functions concerning corporate affairs are reserved to officers and directors and *not* to shareholders (BCA § 8.05). And importantly for current purposes, BCA § 12.30(c)(3) provides that dissolution of a corporation does not alter that allocation of roles during the winding-up phase. Neither Winer nor Trustee attempts to refute that principle, and this Court finds it valid and critical to the current dispute.

As already suggested here, none of this is dealt with by Judge Coar. Instead Opinion at 545–46 is imprecise in parsing shareholder powers vis-a-vis director powers or officer powers. But because any shareholder right to receive corporate assets can come only after the claims of corporate creditors have been satisfied or provided for (BCA § 9.10), and because it is not within the statutorily-conferred powers of shareholders to liquidate a nondebtor corporation to distribute its assets to pay off such creditors, it cannot be that the asserted winding-up power is one of the property rights of Winer as a shareholder that can devolve upon Trustee.

Judge Coar does draw an attempted parallel to Section 363(h), which permits a trustee to sell the interest of a co-owner of property held collectively with a debtor under certain circumstances (such as where partition is impracticable or uneconomical). Opinion at 545 found from that provision that "[t]he prospect of having a trustee administer property as to which entities other than the Debtor have an interest is not alien to the Bankruptcy Code."

But the analogy to Section 363(h) is flawed. That co-debtor provision has as an essential ingredient the very property interest of the debtor whose existence Judge Coar was trying to prove in this instance. That is, the rationale underpinning Section 363(h) is that a trustee's sale of property owned jointly with another entity is justified by the co-owner/debtor's established interest in that property. But here Judge Coar offers the comparison in an effort to prove the existence of the debtor's property interest in the first place. In light of what has already been said about the absence of an express (or otherwise implied) right of that nature in any shareholder qua shareholder, Judge Coar's analogy is an insufficient basis to support his decision that Trustee as shareholder is authorized to liquidate Challenger, a nonbankrupt corporation, for the purpose of administering its assets. That being so, any claimed shareholder power to effect the distribution of Challenger's assets—which is a necessary precondition to barring EF & G's ability to enjoin such distribution on automatic stay grounds—must be viewed as nonexistent.

*Winer As Challenger's Director–Officer*

■ EF & G readily acknowledges that Winer personally maintains the power to wind up Challenger's affairs by virtue of his status as corporate President. But that really launches rather than ends the analysis. To violate the automatic stay EF & G's suit must attempt "to obtain possession of ... or to exercise control over property of the estate." Hence EF & G does not run afoul of Section 362 unless the power to wind up Challenger's affairs is a species of property that has passed into the bankruptcy estate.[19] Thus the issue turns on

---

**19.** Winer's argument on this point reveals a fundamental misunderstanding of Section 362(a). His Mem. 13 (statutory citations omitted) says:

> [E]ven if EF & G's statement of Illinois corporate law were correct, the automatic stay protects not only the Trustee but also the debtor. Therefore, even assuming *arguendo* that the Trustee did not step into the Debtor's interests

as a director of Challenger, the stay still protects against actions which affect the debtor's rights as a director.

Quite to the contrary, the scope of the automatic stay does not reach every intangible interest held by the debtor, but is instead expressly limited to *property* rights that become components of the bankruptcy estate.

whether the winding-up power attendant to Winer's status as a corporate officer is a personal (that is, non-"property") power, or whether it is rather one to which Trustee has succeeded following Winer's bankruptcy.

To recapitulate the statutory language, Section 541(a)(1) defines property of the bankruptcy estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." Because Judge Coar determined that Winer's power to effectuate the winding up of corporate affairs satisfied that definition, he held that EF & G's prayer for injunctive relief was an action seeking to exercise control over property of the bankruptcy estate in violation of the automatic stay. This Court disagrees entirely.[20]

Opinion at 545 rested its holding on two antiquated lower court cases that decided that certain powers—as contrasted with a debtor's interests in specific property—may become part of the bankruptcy estate. Judge Coar there cited *Moore v. Herrink*, 77 F.2d 96 (4th Cir.1935) (per curiam), a two-paragraph opinion that concluded that a bankruptcy trustee for a corporation had been vested with the power to nullify the pre-bankruptcy actions of its board of directors, and *In re Newfoundland Syndicate*, 196 F. 443, 446 (D.N.J.1912), a decision that a bankruptcy trustee for another corporation had succeeded to the right of the directors of the bankrupt corporation to cause an assessment to be made on all unpaid shares of stock.

Quite apart from the factors (1) that both cases predate Section 541(a) and (2) that the powers at issue there bear no better than a dubious resemblance to the power to wind up corporate affairs, the cases themselves are totally irrelevant to the issue at hand. As Judge Coar acknowledged, each case involved a trustee for a *corporate* debtor. Thus the issue in both cases was whether the *trustee for a bankrupt corporation* becomes vested with the powers of that corporation's officers. That of course poses a completely different problem from the one at hand.[21] It sheds no light on the question whether the trustee for an individual bankrupt debtor succeeds to the debtor's personal status as director with the power to wind up a nondebtor corporation's affairs.

That question appears to be one of first impression, not only from the absence of relevant guidance provided by the litigants but because this Court's own research has uncovered none. This opinion must therefore consider the conceptual question whether the power to wind up corporate affairs is the type that rises to the level of "property" in the legal sense.

There are some cases that have labeled certain intangible powers as passing to the trustee as "property" of the estate—see, e.g., *In re Grant*, 21 F.2d 88, 89–90 (W.D.Wis.1927) (insured's rights to change beneficiaries and to obtain payment of the surrender value on insurance policies) and *In re Vermont Toy Works, Inc.*, 135 B.R. 762, 768 (D.Vt.1991) (power to invoke equitable doctrine of marshalling of assets).

> [T]he Bankruptcy Code gives the trustee wide-ranging management authority over the debtor. In contrast, the powers of the debtor's directors are severely limited. Their role is to turn over the corporation's property to the trustee and to provide certain information to the trustee and to the creditors. Congress contemplated that when a trustee is appointed, he assumes control of the business, and the debtor's directors are "completely ousted."

That result is consistent with *Moore* and *Newfoundland Syndicate*, but it too has no bearing at all on the question facing this Court, as next stated in the text.

---

**20.** Because this opinion concludes that Winer's winding-up power does not qualify as property of the estate under Section 541(a), it does not address EF & G's fallback argument that such power is specifically excluded under Section 541(b)(1) as a "power that the debtor may exercise solely for benefit of an entity other than debtor."

**21.** Incidentally, that question has been given a definitive answer in *CFTC v. Weintraub*, 471 U.S. 343, 352–53, 105 S.Ct. 1986, 1992–93, 85 L.Ed.2d 372 (1985) (citations omitted), which decided that the power of those who manage a debtor corporation to exercise or to waive the attorney-client privilege is transferred to that corporation's bankruptcy trustee:

But such particularized holdings clearly do not automatically lead to the same conclusion as to all powers that are exercisable by a debtor. To choose some obvious examples at or near the end of the spectrum of non-"property," a trustee plainly does not succeed to a man's status as a husband so as to obtain the power to bring or defend a divorce action, nor does he or she inherit such other statuses as membership in an exclusive club or election to political office. No one could seriously contend that the rights and powers corresponding to those positions become "property of the estate."

■ Where does the corporate officer's or director's power to wind up a nondebtor corporation's affairs fit into that continuum? This Court holds that such a personal power does not vest in the trustee so as to pass into the bankruptcy estate. It must be remembered that a corporate officer or director is indeed chosen personally and is the repository of fiduciary obligations in that capacity. Hence the argument that a trustee steps into the director's or officer's shoes as to governing a non-bankrupt corporation merely because that fiduciary later files for bankruptcy is unconvincing.[22] After all, the bankrupt director or officer has not died or become incapacitated in any way that would affect his or her job performance. There is no reason why the debtor cannot or should not continue to function in his or her role instead of transferring the position to the trustee.

Because Trustee does not succeed to Winer as Challenger's director or its President to wind up its corporate affairs, that power remains vested in debtor Winer. It has not become property of Winer's bankruptcy estate as defined by Section 541(a). It follows directly that the Challenger Action's prayer for injunctive relief pending resolution of EF & G's substantive claim does not interfere with or attempt to exercise control over estate property, so that it too does not violate the Section 362(a) automatic stay to protect Winer's bankruptcy estate.

### Conclusion

Neither facet of the Challenger Action violates the Section 362 automatic stay as an attempt to exercise control over the property of the bankruptcy estate. Accordingly the Bankruptcy Court's order in Case No. 1056 is reversed. And because the award of damages in favor of Trustee and Winer in Case No. 2138 was based on Judge Coar's decision in the other case, it too is reversed.

### EXHIBIT 1

This document entered into on April 20, 1989 shall serve as a preliminary understanding between Challenger Software ("Challenger") and Daniel M. Benzaquen, Joel H. Cohen, and Patrick A. Horan ("Partners"). It is understood between both parties that this document shall serve as a basic understanding between the parties and will be replaced by an official stock transfer agreement when the agreement is completed by Challengers counsel, and approved by Partners counsel.

Whereas, Challenger is interested in obtaining investment capital from Partners

Whereas, Challenger has informed Partners of its financial difficulties and of the legal problems involved in the Challenger/MicroPro marketing agreement

Whereas, Partners is interested in helping to fund Challenger.

Whereas, Partners is aware that this investment involves risk outlined above and in discussions that have taken place between the parties

Now, Therefor in consideration of receiving a twenty five percent (25%) equity position in Challenger, Partners shall pay Challenger fifty thousand dollars ($50,000.00). additional equity shall be available to Partners for incremental costs of twenty-five thou-

---

**22.** That question finds a useful analogy to a personal services contract, for there too the individual who later goes into bankruptcy must undertake the contemplated action (see *In re Noonan,* 17 B.R. 793, 797–98 (Bankr.S.D.N.Y. 1982) (personal services contract is not property of the estate)).

sand dollars (25,000.00) per seven and one half percent (7.5%) of Challenger exercisable at Partners discretion not to exceed a total investment of 40% of Challenger

the parties agree that Partners is interested in Challenger only as an investment and is not interested in the control or day to day management of Challenger.

the parties agree that the stock shall not have voting rights.

the parties agree that Partners shall have the right to receive dividends or exchange stock if Challenger is in a profitable condition or based upon reasonable expenses and reasonable management, and such an arrangement would not adversely effect the operation of Challenger.

the parties agree that the stock is transferable

the parties agree that Challenger shall have the opportunity to purchase the stock back from Partners at any time for either the current net worth of the stock, or a value agreed by the parties, or an amount equal to any offers received by Partners by third parties, within 7 days of offer

The parties agree that the investment capital of Partners shall be returned to Partners and dividends will be distributed to Partners in proportion to their equity ownership as identified by stock certificate # _____ once Challengers cash flow becomes positive and Garry Winer the president of Challenger receives payment on the notes he has with Challenger.

The Partners shall share the above investment in Challenger as follows:

Daniel M. Benzaquen (44,30%)

Joel H. Cohen (44.30%)

Patrick A. Horan (11.40%)

Garry Winer

President

/s/ Garry Winer

Joel Cohen

Partner

/s/ Joel Cohen

EXHIBIT 2

April 21, 1989

$50,000.00

Garry Winer, for the value received, the undersigned promises to pay to the order of Daniel M. Benzaquen (44.30%), Joel H. Cohen (44.30%) and Patrick A. Horan (11.-40%) Fifty Thousand Dollars ($50,000.00) within a period of one year from this date. In consideration of Zero percent (0%) interest, Garry Winer further promises to convey a twenty-five percent (25%) equity position in Challenger Software, per the preliminary stock transfer agreement dated April 20, 1989.

This note shall be binding upon and inure to the benefit or their respective heirs, executors, administrators, successors and assignees of the parties hereto.

> Agreed:
> /s/ Garry Winer
> Garry Winer

THIS NOTE IS HEREBY ASSIGNED TO E.F. & G., L.T.D., A COLORADO CORPORATION.

/s/ Joel H. Cohen December 2, 1991
/s/ Daniel M. Benzaquen December 2, 1991
/s/ Patrick A. Horan December 2, 1991